Otis STOKES, Plaintiff,

v.

L. GEISMAR, S.A. et al., Defendants.

Civ. A. No. 92–525.

United States District Court,
E.D. Virginia,
Richmond Division.

March 8, 1993.

---

905

David Bagley Rheingold, Walter Herman Emroch, Walter Emroch and Associates, Richmond, VA, for plaintiff.

Edward Joseph Fuhr, James Edward Farnham, Matthew James Calvert, Hunton & Williams, Richmond, VA, for defendants L. Geismar, S.A. and Modern Track Machinery, Inc.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on defendant L. Geismar, S.A.'s ("Geismar's") renewed motion to dismiss for lack of personal jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(2), and defendant Modern Track Machinery's ("Modern Track's") motion for summary judgment, joined by Geismar, pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, the Court denies Geismar's motion to dismiss, and grants the defendants' motion for summary judgment.

1. Plaintiff's counsel strenuously argues that it is not responsible for the absence of the saw. The Court is without sufficient information to definitively apportion blame for the post-accident failure to segregate, identify or label the saw used by Stokes. The Court assumes, for purposes of deciding this motion, that the plaintiff's attempts to secure the product were diligent and reasonable. In other words, the Court's holding is not prem-

### I. Facts

Plaintiff Otis Stokes ("Stokes") lost his left eye as a result of an accident which occurred on December 18, 1991, while he was using, in the course of his employment with Rail Tec, Inc. ("Rail Tec") at the Aqualon plant in Hopewell, a rail cutting saw (including an abrasive cut-off disc) that the defendants allegedly manufactured and/or placed in the stream of commerce. The specific circumstances surrounding the accident are unclear; no one witnessed the action and Stokes, himself, cannot testify with any certainty about what actually caused his injuries.

In fact, the saw which Stokes was using at the time of his accident has not been located or produced during the course of discovery.[1] Plaintiff has submitted photographs, apparently taken months after the accident, of a saw which is similar to, or possibly the same as, the saw used by Stokes. These photographs, taken long after the accident and which do not even definitively depict the saw used by Stokes, are simply not probative. They certainly do not in any way compensate for the disappearance of the saw itself, which has never been produced or inspected to this date. Portions of the cut-off disc used in the saw which plaintiff was operating when he was injured were, however, retrieved after the accident and have been inspected by experts for both sides.

Stokes asserts that his eye was destroyed either because of a design defect in the rail saw's protective guard[2] or a manufacturing defect in the disc. Stokes essentially contends that if the guard on the saw operated by Stokes had been extended even slightly to cover more of the disc, the injury suffered by Stokes could have been avoided. He also contends that an imperfection or "twist" in the disc caused it to rupture and cause his injuries.

ised on any misconduct on the part of plaintiff or his attorneys.

2. A portion of the disc on the type of rail saw at issue in this case is typically enclosed by a metal guard on the saw which shields the operator from the disc.

Stokes' only claim against Modern Track is for breach of implied warranty of merchantability. Against Geismar, in addition to the warranty theory, Stokes is pursuing claims for negligent design of the protective guard and negligent manufacture of the disc.[3] While a host of defendants originally were named in this lawsuit, only Geismar and Modern Track remain.

## II. *Motion to Dismiss*

### A. *Background*

Geismar, a French corporation, has renewed its Rule 12(b)(2) motion that was originally filed on August 4, 1992. On October 9, 1992, the Court provisionally denied the motion until such time as the plaintiff could take the depositions, under Fed.R.Civ.P. 30(b)(6), of Modern Track, Geismar and Stumec.[4] The Court's Order provided that "at such time as these depositions are completed, the Court grants leave to the defendants to renew their Motion to Dismiss." The last Rule 30(b)(6) deposition was taken on January 26, 1993, and Geismar renewed its motion to dismiss soon thereafter, on February 4.

### B. *Facts about Geismar*

Geismar is a French corporation in the business of manufacturing and distributing equipment used in the construction and maintenance of railroad tracks. Geismar has subsidiaries throughout Europe and the world. The sole distributor of Geismar products in the United States is Modern Track, a subsidiary wholly owned by Geismar, which concedes that it is subject to the jurisdiction of the Court. The president of Modern Track, Claude Geismar, is also the president of Geismar. The treasurer of Modern Track, Claude Prevost ("Prevost"), is an administrator (the equivalent of a member of the board of directors) of Geismar. Prevost is the sole officer of Modern Track located in the United States and he does not appear from the record to exercise much important autonomous decision-making authority. There is no regular meeting of Modern Track's officers or board of directors in the United States. Several other details indicate that the operations of Modern Track and Geismar are inextricably intertwined.

Approximately 80 percent of Modern Track's sales involve Geismar products. John Fox Dep. at 3; Christophe Natali Dep. at 15. While sales figures to specific states have not been determined, it is known that from July 1986 to February 1991, Rail Tec purchased over $28,000 worth of materials from Modern Track.

### C. *Analysis*

To satisfy constitutional due process, a defendant must have certain minimum contacts with the forum State such that maintenance of a suit does not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Virginia's long-arm statute has been construed to be as broad as the standard of constitutional due process. *Kolbe, Inc. v. Chromodern Chair Co.*, 211 Va. 736, 180 S.E.2d 664, 667 (1971). Accordingly, if the exercise of personal jurisdiction over Geismar satisfies the due process requirements of the U.S. Constitution, its motion to dismiss must be denied.

The fact that a foreign parent, like Geismar, conducts its marketing and distribution in the United States through an independent distribution system does not shield it from *in personam* jurisdiction. *Weight v. Kawasaki Motors Corp.*, 604 F.Supp. 968, 971 (E.D.Va. 1985). Due process is satisfied as long as the foreign manufacturer knew and intended that its product would be sold in Virginia. *Id.* This inquiry boils down to a factual inquiry about whether Geismar purposefully availed itself of the benefits of the Commonwealth.

The Supreme Court has stressed in this context that purposeful availment, not mere foreseeability, must be demonstrated. "A

---

3. Defendants contend that discovery has conclusively demonstrated that the disc in question was not even manufactured by Geismar. The Court cannot definitively discern from the record whether this is, in fact, the case, but assumes solely for purposes of deciding this motion that Geismar was involved in the design and manufacturing of the disc.

4. Stumec, an original defendant to this action, has since been dismissed by the plaintiff.

defendant's awareness that the stream of commerce may or will sweep the product into the forum state does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state." *Asahi Metal Indus. Co. v. Superior Court of California,* 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987). The facts of *Asahi,* however, are far different from those of the case *sub judice,* and illustrate that this Court's retention of jurisdiction over Geismar is fully in accord with the reasoning of *Asahi.*

The foreign defendant challenging jurisdiction in *Asahi,* a Japanese corporation, sold tire valve assemblies to Cheng Shin, a Taiwanese corporation for use as components in finished tire tubes. Cheng Shin then turned around and sold its product in America. The Supreme Court held that jurisdiction over the Japanese defendant could not be predicated on its mere ability to foresee that its product might eventually wind up in California—without independent action on its part to avail itself of the California market. Interestingly, among the factors the Supreme Court found instructive was that the foreign entity "did not create, control, or employ the distribution system that brought its valves to California." *Id.*

In this case, Geismar did, to a great extent, create, control and employ the distribution system that brought its product to Virginia. Its United States distribution was handled exclusively by Modern Track, its wholly owned subsidiary. While it does not appear that Modern Track is a fictitious shield—an alter ego—erected by Geismar solely to shield itself from liability, Geismar exerts a sufficient amount of control over Modern Track, and the distribution of its products through that entity, to be purposefully availing itself of the U.S. market. There is no evidence of any attempt on the part of either Geismar or Modern Track to limit their U.S. marketing strategy to avoid Virginia or any other particular state. Instead, it appears that Geismar, through Modern Track, aggressively and willingly sold to entities located throughout the United States, including Virginia, thereby purposefully availing itself of Virginia, as well as other states', markets.

Geismar should not be permitted to distribute its products throughout the United States, but at the same time shield itself from liability by acting through a subsidiary, especially when the entities are headed by the same individuals and have such overlapping operations.

In deciding to retain jurisdiction over Geismar, the Court is, of course, cognizant that "the unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi,* 480 U.S. at 114, 107 S.Ct. at 1033. Of course, when the president of the foreign corporation is also president of its American subsidiary, the sole resident officer of the subsidiary is a member of the foreign parent's board of directors, the subsidiary is the sole American distributor of the parent's products, sale of the foreign parent's products constitutes 80% of its subsidiary's business, and when the operations of the parent and subsidiary are inextricably intertwined, the obstacles posed by the American legal system do not appear formidable. Accordingly, the Court retains jurisdiction over Geismar and denies its motion to dismiss.

### III. *Summary Judgment*

▪ Under Virginia law, a plaintiff must make two threshold showings to prevail in a products liability lawsuit. First, he must show "that the [allegedly] unreasonably dangerous condition existed when the goods left the defendant's hands" and that the product "was not substantially changed after the time of sale." *Logan v. Montgomery Ward & Co.,* 216 Va. 425, 219 S.E.2d 685, 687 (1975); *Bly v. Otis Elevator Co.,* 713 F.2d 1040, 1043 n. 2 (4th Cir.1983). Second, the plaintiff must demonstrate with "reasonable certainty" that the defendant caused the plaintiff's injuries. *Boyle v. United Technologies Corp.,* 792 F.2d 413, 416 (4th Cir.1986). In this case, plaintiff can do neither.

### A. *The "Defectively Designed Guard" Claim*

▪ Plaintiff proposes to introduce the testimony of Craig Clauser to show that an extension of the rail saw's protective disc

guard would have saved plaintiff's eye. Of course, Clauser's theory is predicated on his ability to determine the condition of the guard at the time of the accident. Without the saw or eyewitness testimony, however, neither Clauser nor anybody else for that matter, can ascertain the position of the guard or even verify whether one was in place at the time of the accident.

*Bly* and *Logan* require plaintiff to show, on the guard-related claim, that the guard was in substantially the same condition at the time of the accident as it was when it was sold from Modern Track to Rail Tec. Plaintiff has failed entirely to meet this burden. There is no concrete evidence in this case that there was a guard on the saw when plaintiff used it. Even if a guard was on the saw, plaintiff has adduced no proof to demonstrate that the guard was in its original form, that it was properly aligned, or that it had not been damaged prior to plaintiff's accident.

There is evidence, for example, that Rail Tec purchased a new guard just months before the accident. Glenn Healey Dep. at 130. The guard was put on the machine by Rail Tec itself. There is no evidence that the guard was installed properly or in the same position as the original guard. Plaintiff, in fact, concedes that the guard can be adjusted and put in different locations. Pl.'s Br. at 10. Without access to the saw, the parties have not been able to make any sort of reasonable assessment, based on anything more than speculation, of the guard's condition, position or existence at the time of the accident.

Clauser's design defect theory poignantly illustrates the importance of faithful adherence to *Logan* and *Bly*. Clauser opines that a "slight" change in the position of the guard would have deflected flying debris away from plaintiff's face. Clauser Dep. at 209. Clauser necessarily assumes, without the benefit of any evidence, that the guard was positioned in an ordinary fashion. If the position of the guard deviated just a little bit from its standard location, Clauser's theory would be negated. If the guard had somehow been damaged prior to the accident so that it could not effectively protect the saw's user, Clauser's theory would be negated. Obviously, if there was no guard at all on the saw, Clauser's theory would be negated. Plaintiff has simply adduced no proof to show, as *Bly* requires, that substantial modifications were not made to the guard after it reached Rail Tec.

Of course, plaintiff's inability to prove the condition of the guard at the time of the accident is closely linked with his inability to create a jury issue regarding the accident's cause. After all, "the law of products liability in Virginia does not permit recovery where responsibility is conjectural." *Boyle*, 792 F.2d at 415. It is a well-established principle of Virginia products liability law that where there is more than one possible cause of an injury, the plaintiff must show, with "reasonable certainty," *Boyle*, 792 F.2d at 416, that the defendant caused the injury. The language defining the plaintiff's obligation in this regard applies with equal force to both of plaintiff's theories of recovery in this case:

> When there is substantial evidence introduced which tends to prove that plaintiff's injuries may have resulted from one of two causes, ... the plaintiff must fail if his evidence does not prove that his damages were produced by the negligence of the defendant; and he must also fail if it appears from the evidence just as probable that damages were caused by one as by the other because the plaintiff must make out his case by a preponderance of the evidence.

*Cape Charles Flying Serv., Inc. v. Nottingham*, 187 Va. 444, 47 S.E.2d 540, 544 (1948), *quoted in Boyle*, 792 F.2d at 415-16.

A defectively designed guard on the saw is by no means "the only reasonable inference that can be drawn to explain" the accident. *See Logan*, 219 S.E.2d at 688; *Boyle*, 792 F.2d at 416. In light of the host of other explanations for the accident, many acknowledged by plaintiff's own experts, such an inference simply cannot be reasonably drawn within the evidentiary vacuum in which the Court, and any potential factfinder, has been placed. As an initial matter, the existence, size and position of the guard at the time of the accident can never be reasonably ascertained without the saw or credible eyewitness

testimony—neither of which have been placed before the Court. Furthermore, Clauser, the expert who seeks to articulate the guard theory, concedes that it is not simply the size of the guard (which of course, remains unknown) that would bear on the trajectory of a broken disc fragment, but also the angle at which the saw was held relative to the rail and the position of the operator relative to the guard. Clauser Dep. at 208–12. Neither of these plausible explanations for the injury can be proved or disproved because of the absence of any eyewitnesses to the accident.[5] John Mason, plaintiff's expert on abrasives, highlighted the conjectural nature of Clauser's theory in his deposition:

Q. So, in your view, whether the guard was slightly shy of covering 180 degrees of the disc is immaterial?

A. Let me say it's a moot point. I don't know whether it was immaterial or not.

Q. It's moot because you don't believe anybody can determine whether it made a difference?

A. That is right.

Q. And that's because it's virtually impossible to determine the path of a projectile flying away from abrasive discs?

A. That is right.

Mason Dep. at 124. The Court cannot submit this issue to a jury of laypersons when experts in the field acknowledge that it is not susceptible to reasonable determination. The case for defendants is even more power-ful here than in *Boyle* because plaintiff's own experts in this case concede that the accident could reasonably be attributed to more than one cause.

"If the cause of the event is left to conjecture, guess, or random judgment, the plaintiff cannot recover." *West Point v. Evans*, 224 Va. 625, 299 S.E.2d 349, 351 (1983). An expert witness' endorsement of a wholly speculative theory of causation does not cure the plaintiff's case under Virginia, or any other law.[6] Courts, in fact, are "particularly wary of unfounded expert opinion when causation is the issue." *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1249 (E.D.N.Y.1985). *See also Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.Cir.1977) (affirming entry of summary judgment because expert's opinions were, *inter alia*, based on "unsupported assumptions"); *Gilbert v. Gulf Oil Corp.*, 175 F.2d 705, 709 (4th Cir.1949) ("expert testimony may not be received unless it appears that the witness is in possession of such facts as would enable him to express a reasonably accurate conclusion as distinguished from guess or conjecture"). The Court is mindful of the ease with which parties can procure so-called experts nowadays to endorse almost any theory of a case. The presence of such an expert does not divest the Court of its responsibility to determine the reasonableness of a theory of causation before submitting it to the jury. In this case, an expert's endorsement cannot save what remains a theory based on guesswork.

---

**5.** The Court does not rule, as a matter of law, that plaintiff was contributorily negligent in this case. Such a holding is wholly unnecessary to support its rationale for awarding summary judgment. It is worth noting, however, that there is ample evidence in the record—including plaintiff's own testimony—to show that plaintiff may not have been operating the saw in accordance with applicable warnings and instructions. Thus, the possibility that mishandling of the saw was the cause of the accident is not mere speculation, but rather as reasonable, if not more reasonable, an explanation for the accident than either the guard or disc theories propounded by the plaintiff.

**6.** Clauser's "endorsement" of the guard theory is shaky at best. He confirmed the speculative nature of his opinion in his deposition testimony:

Q. Mr. Stokes was not able to say, was he, how the projectile got from the disk [sic] to his eye?
A. No.
Q. And nobody, to your knowledge, witnessed how it happened?
A. Correct.
Q. Nobody knows from what point on the disk [sic] the piece fell off or was flown off that hit him in the eye; is that right?
A. No, that is right.
Q. Your conclusion that the piece of disk [sic] broke off and hit his eye as a result of coming in contact with the guard is made on your own speculation, if you will, as to how it occurred.
A. Reconstruction, yes.
Clauser Dep. at 189–90.

## B. The "Defective Disc" Claim

■ In light of the law set forth above, plaintiff's "defective disc" theory of recovery in this case similarly cannot withstand defendants' summary judgment motion.

As a preliminary matter, plaintiff cannot show, as *Logan* and *Bly* require, that the twist found in one of the disc fragments existed at the time. the disc was sold to Rail Tec. Ample evidence has been introduced that such a defect could have resulted from improper storage or improper handling. The defendants also have presented evidence indicating that a disc could become warped during operation of the saw or as a result of a disc breaking. Plaintiff has not demonstrated that a twist like the one present in the disc at issue can only reasonably be attributed to a manufacturing defect.

In fact, Mason, the very expert whom plaintiff proposes to use to support his "defective disc" theory, admitted in his deposition that the cause of the defect in the disc could not be reasonably determined. Mason testified that he had "no opinion" about the cause of the twist or warpage and that "it is very difficult to prove" which of the "three or four reasons" caused the twist. Mason Dep. at 215–26. He testified that the possibility that the disc twisted "post-sale" could not be ruled out. *Id.* at 216, 231. Indeed, he agreed that he had no reason to believe that improper manufacturing was any more likely than the possible post-sale causes of warpage. *Id.* at 216.

Plaintiff has attempted to shore up Mason's damaging testimony by submitting, after his deposition, a wholly unsubstantiated and conclusory affidavit offering Mason's "opinion" about the accident. This last-ditch effort to create a jury question will be disregarded. The Fourth Circuit has held that when a district court is faced with conflicts between an expert witness' testimony given at deposition and that submitted in a conclusory, eleventh-hour affidavit, it is justified in disregarding the affidavit. *Rohrbough v. Wyeth Laboratories, Inc.,* 916 F.2d 970, 976

(4th Cir.1990). As it was in *Rohrbough,* the Court is convinced that the Mason affidavit "may not represent the considered opinion of the [expert] himself, but rather an effort on the part of the plaintiff to create an issue of fact." *Id.*

Plaintiff's contention that it only needs the recovered disc fragments to prove its "defective disc" theory is without merit. As previously discussed, the disc alone does not enable the plaintiff to show how the twist occurred. While the disc appears to be flawed now, no one can tell whether that defect existed at the time the disc was sold to Rail Tec, or whether it was the result of improper modifications, faulty maintenance, or improper use of the saw by plaintiff on the date of his accident.[7] Again, the proffering of an expert on this issue who will bless a guess-based theory will not suffice to withstand summary judgment. Plaintiff has failed to meet his burden under *Logan* and *Bly* to show that the defect existed at the time of the sale and that the disc had not been substantially altered after it reached Rail Tec.

Furthermore, plaintiff cannot reasonably argue, as *Boyle* requires, that the disc *caused* the accident. In order to single out the disc as the cause of the accident, a host of other plausible explanations for its occurrence must be ruled out. The Court does not believe that these causes can be eliminated when the saw has never been inspected and no one witnessed the accident. Evidence exists to suggest that the accident could have been caused by any number of factors: improper operation of the saw; poor maintenance; running the saw at an improper speed; improper modification of the saw after its sale to Rail Tec; defective or worn down saw parts like its pulleys, drive belt and filters (which can enhance the likelihood of a disc rupture); misalignment of the disc bearings in the front end of the saw; or a malfunctioning or faulty vise and guide mechanism.[8] This case presents an even

---

7. The apparent failure of Rail Tec to adhere to any sort of formal quality control procedure also diminishes plaintiff's ability to make this showing.

8. The vise and guide apparatus that anchors the saw to the rail being cut apparently performs vital safety functions. First, it ensures that every cut is precise and straight, because if a cut is not

more compelling scenario for a defense judgment than *Boyle*, where the Court was faced with only two possible accident explanations. Here, a myriad of causes could have explained the tragic accident suffered by plaintiff; plaintiff has not presented evidence establishing that his proposed explanations are any more reasonable than the others. Accordingly, he cannot satisfy the requirements of *Boyle*, and defendants are entitled to summary judgment as a matter of Virginia products liability law.

### III. *Conclusion*

"A plaintiff [in a Virginia products liability lawsuit] must show why and how the incident happened. And if the cause of the event is left to conjecture, guess, or random judgment, the plaintiff cannot recover." *West Point*, 299 S.E.2d at 351, *quoted in Boyle*, 792 F.2d at 416. Without the saw operated by plaintiff on the day he was injured, and in the absence of any eyewitness testimony, plaintiff cannot meet this burden in this case. The Court, faced with a severe evidentiary void which prevents plaintiff from satisfying his obligations under Virginia products liability law, is directed both by the Supreme Court of Virginia and the Fourth Circuit to enter summary judgment for the defendants in this case.

properly aligned, a disc can pinch and rupture. Second, a vise and guide partially relieves the operator of the substantial burden of holding the saw while operating it.