CORTLANDT RACQUET CLUB, INC., 87 Albany Road, Montrose, N.Y. 10548, Plaintiff,

v.

OY SAUNATEC, LTD., Pohj Pallbont 1, FI–10901 Hanko Finland,

and

Saunatec, Inc., 575 E. Cokato Street Cokato, MN 55321

and

H.B.C., Inc. d/b/a Helo Saunas from Finland 601 Lewis Avenue, North, Watertown, MN 55388

and

Electro–Geratebau GmbH, Postfach 1180 D–76032 Oberderdingen Germany, Defendants.

No. 96 C.V. 1671(SS).

United States District Court, S.D. New York.

Sept. 29, 1997.

Daniel Q. Harrington, Cozen & O'Connor, New York City, for plaintiff.

Leslie F. Ruff, Hilde Holland, Biedermann, Hoenig, Massamillo & Ruff, New York City, for defendant Electro–Geraetebau.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

Plaintiff Cortlandt Racquet Club, Inc. ("Cortlandt") brings this action to recover damages in connection with a fire at plaintiff's health club allegedly caused by a high-limit switch manufactured by defendant E.G.O. Elektro–Geraetebau GMBH ("EGO"). Defendant EGO moves for summary judgement seeking to be dismissed from this action based on a lack of personal jurisdiction. For the reasons to be discussed, defendant's motion is GRANTED.

## BACKGROUND

EGO is a German corporation duly organized under the laws of the Federal Republic of Germany with its principle place of business in Germany. EGO is engaged in the design, manufacture and sale of thermostats, high-limit switches and other products. At issue is a high-limit switch whose final destination was a sauna in a health club in New York State.

EGO has never maintained any personnel, bank accounts, real or personal property, sales-offices or agents in the state of New York, nor has it attended any trade shows in

the state. EGO has never entered into a contract to supply goods or services to New York. EGO derives income from sales of products throughout the United States, however, and has made efforts to ready its products for use in this country. For instance, EGO has procured an Underwriters Laboratories ("UL") listing on some of its products. Also, EGO publishes English language catalogues and technical drawings.

Over the five-year period from 1991 to 1996, EGO transferred $24.9 million worth of EGO products for distribution in the United States to EGO Products, Inc., ("EPI") a Georgia corporation characterized by defendant, and recognized by plaintiff, as EGO's "exclusive" United States distributor. (Opp. at 16.) EGO derives a 15% commission from EPI's sales of these goods. Over the same five-year period, EPI sold approximately $358,000 worth of EGO products to New York customers, with EGO's commissions totaling $ 53,738.03.

The high-limit switch at issue in this action was not distributed through EPI. (Letter from Harrington of 9/24/97; Letter from Ruff of 9/25/97.) EGO manufactured the high-limit switch in question in Germany and sold it to Elektro–Geraete AG Zug ("EGO Zug"), a Swiss corporation.[1] EGO Zug then sold the switch to its Norwegian subsidiary, EGO Nordisk. EGO Nordisk, in turn, sold the switch to Helo Saunas, an unrelated Finnish corporation. Next, Helo Saunas installed the switch into one of its products in Finland. From there, the sauna somehow "found its way" into New York—as plaintiff puts it—but neither side details precisely how. (Letter from Harrington of 9/24/97.)

Plaintiff Cortlandt owned and operated a health club known as the Club at Montrose (the "Club") located in Montrose, New York. On or about February 8, 1994, Cortlandt purchased a model SKLE 120 sauna heater, Serial Number A40778–102, designed and manufactured by Oy Saunatec Ltd. and distributed and sold by Saunatec, Inc. and H.B.C., Inc. for use in the men's sauna at the Club. The aforementioned sauna heater was equipped with the high-limit switch manufactured by EGO in Germany.

On or about August 30, 1994, the aforementioned sauna heater caused a fire in the men's sauna at the Club causing extensive damage. Plaintiff brings this action against Oy Saunatec, Ltd., Saunatec, Inc., H.B.C., Inc., and EGO seeking damages. EGO has moved for summary judgement, pursuant to Rule 56 Fed.R.Civ.P., seeking dismissal of the action against it for lack of personal jurisdiction.

## DISCUSSION

### I. Summary Judgement

Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986); *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995). It is the moving party who bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of " 'the pleadings, depositions, answers to interrogatories, and affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Federal Deposit Ins. Corp. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). Once the moving party has provided sufficient evidence to support a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir.1994). When deciding a motion for summary judgment, this Court must "view the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. v. Nordic Leasing*,

---

1. The parties disagree as to whether EGO and EGO Zug share a common ownership. For purposes of this motion, the Court accepts plaintiff's allegation that the two companies are in some way affiliated.

*Inc.*, 42 F.3d 725, 728 (2d Cir.1994). Summary judgement is appropriate if, after drawing all reasonable inferences and ambiguities in the nonmovant's favor, no genuine issues of material fact exist and the movant is entitled to judgement as a matter of law. Fed.R.Civ.P. 56(c); *see also Greene v. United States*, 13 F.3d 577 (2d Cir.1994); *Metropolitan Life Insurance Company v. Jackson*, 896 F.Supp. 318 (S.D.N.Y.1995).

## II. Personal Jurisdiction

■ Subject matter over the claim against EGO is based on diversity of citizenship, 28 U.S.C. § 1332. Therefore, the issue of personal jurisdiction is determined by the law of the forum state. *See Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir.1990) (citing *Arrowsmith v. United Press Intern.*, 320 F.2d 219, 222–25 (2d Cir .1963)). In particular, plaintiff alleges that defendant EGO is subject to jurisdiction pursuant to either of two provisions of New York law, N.Y.Civ.Prac.L. & R. § 302(a)(3)(ii) or alternatively N.Y.Civ. Prac.L. & R. § 302(a)(3)(i). In pertinent part, these sections provide as follows:

[A] court may exercise personal jurisdiction over any nondomiciliary ... who in person or through an agent:

3. commits a tortious act without the state causing injury to person or property within the state ... if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce ...

The Court will consider each subdivision of the statute individually, viewing all of the evidence most favorably to plaintiff.

**A. Section 302(a)(3)(ii)**

■ Four elements are necessary to a finding of personal jurisdiction under Section 302(a)(3)(ii): (1) defendant committed a tortious act outside the state, (2) defendant's tortious activity caused injury to a person within the state, (3) defendant should reasonably have expected the act to have consequences in the state, and (4) defendant derives substantial revenue from interstate or international commerce. *See Berardi v. Dah Yang Industry Co., Ltd.*, 1995 WL 5862 (S.D.N.Y. Jan.6, 1995). Both plaintiff and defendant agree that the only element of jurisdiction under 302(a)(3)(ii) that is in dispute is whether EGO should reasonably have expected its action in manufacturing the allegedly defective product to have consequences in New York State.

■ "The test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than a subjective one." *Allen v. Auto Specialties Mfg. Co.*, 45 A.D.2d 331, 357 N.Y.S.2d 547 (3d Dept.1974). The mere likelihood that a product will find its way into the forum state is insufficient to support jurisdiction. *Asahi Metal Ind. v. Superior Court of California, Solano County*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). In other words, mere foreseeability of in-state consequence and failure to avert that consequence is not sufficient to establish personal jurisdiction under New York's long-arm statute. *See Bensusan Restaurant Corp. v. King*, 937 F.Supp. 295 (S.D.N.Y.1996), *aff'd*, 1997 WL 560048 (2d Cir.1997). To serve as a basis for jurisdiction, foreseeability must be coupled with a purposeful act invoking the benefits and protections of New York law. *See Schaadt v. T.W. Kutter, Inc.*, 169 A.D.2d 969, 564 N.Y.S.2d 865 (3d Dept.1991); *see also Murdock v. Arenson Intern., USA, Inc.*, 157 A.D.2d 110, 554 N.Y.S.2d 887 (1st Dept. 1990).[2]

---

**2.** Plaintiff cites *Allen v. Auto Specialties*, 45 A.D.2d 331, 357 N.Y.S.2d 547 (3d Dept.1974) for the proposition that all that must be found is that the "presence of defendant's product in New York with some potential consequence that was reasonably foreseeable rather than fortuitous." *Id.* 357 N.Y.S.2d at 550. *Allen* was decided before

the United States Supreme Court decisions in *Asahi* and *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), however. Those cases and New York cases decided subsequently, make it clear that foreseeability requires an affirmative action on the part of the defendant. In *Woodson*, for in-

This point is well illustrated in *Martinez v. American Standard*, 91 A.D.2d 652, 457 N.Y.S.2d 97 (2d Dept.1982), *aff'd*, 60 N.Y.2d 873, 470 N.Y.S.2d 367, 458 N.E.2d 826 (1983). The *Martinez* case involved an action brought to recover damages for a death resulting from a defective air-conditioning unit. The defendants were American Standard, the unit's manufacturer, and Tecumseh Products Company ("Tecumseh"), the manufacturer of the unit's compressor. Tecumseh subsequently commenced a third-party action against Vitreous State Products ("Vitreous"), a Rhode Island corporation and the manufacturer of terminal pins installed in the Tecumseh compressor. Vitreous moved to dismiss the action against it for lack of personal jurisdiction. The trial court denied the motion.

On appeal, the Second Department reversed the trial court's decision, noting that Special Term "seemingly relied upon a 'stream of commerce analysis', whereby a manufacturer will be deemed to have foreseen consequences of its allegedly defective product by virtue of its placing of that product on the market for general distribution." *Martinez*, 457 N.Y.S.2d at 99. The appellate court understood the United State Supreme Court's decision in *Woodson*, however, to have rejected such analysis. "The mere likelihood that a product will find its way into the forum state is insufficient to require a nonresident defendant to defend suit there." *Id.* Foreseeability alone therefore is not enough to find jurisdiction. Foreseeability must be coupled with an action by which the defendant "purposefully avails itself of the privilege of conducting activities within the forum State." *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283).

The *Martinez* Court wrote that "[i]n the case of a manufacturer this [purposeful availment] would result from a discernable effort to serve, directly or indirectly, a market in the forum state." *Martinez*, 457 N.Y.S.2d at 99. The Court held that Vitreous made no such discernable effort. There was no evi-

dence that Vitreous "knew or should have known where Tecumseh's compressors were destined, or that Vitreous was attempting to reach a New York market through Tecumseh." *Id.* Central to the Court's decision were the facts that Vitreous (1) did not grant a distributorship to a New York resident and (2) did not have an "identity of officers with another nonresident corporation which distributed its product in this state." *Id.*

Analysis of two more recent New York decisions, *Murdock v. Arenson Int'l USA, Inc.*, 157 A.D.2d 110, 554 N.Y.S.2d 887 (1st Dept.1990) and *Schaadt v. T.W. Kutter, Inc.*, 169 A.D.2d 969, 564 N.Y.S.2d 865 (3d Dept. 1991), confirm the continuing vitality of the *Martinez* analysis. In *Murdock*, plaintiff Murdock fell and suffered serious injury when his office chair broke. Murdock commenced an action against the domestic retailer of the chair who in turn brought suit against Arenson International, Ltd., ("AIL"), the British designer and manufacturer of the chair. AIL brought an action against others, amongst them, a component manufacturer, Unerman Greenman Berger Limited ("UGBL"). UGBL brought a motion to dismiss which was denied by the trial court. *See Murdock*, 554 N.Y.S.2d at 888. The First Department reversed and granted UGBL's motion to dismiss for lack of personal jurisdiction under Section 302(a)(3).

The *Murdock* Court highlighted the fact that UGBL was a British corporation whose principal place of business was London. UGBL was never authorized, or qualified to do business in New York, nor did it maintain any "personnel, bank accounts, real or personal property, sales offices, or agents in New York." *Murdock*, 554 N.Y.S.2d at 888. Furthermore, UGBL had "no contact with a New York company concerning the chair component at issue." *Id.* The component in question was sold in Europe to a British corporation. Based on these facts, the Court concluded that the foreseeability requirement of Section 302(a)(3)(ii) was not met and personal jurisdiction could not be asserted.

stance, the Court wrote that "foreseeability alone has never been a sufficient bench mark for personal jurisdiction under the Due Process Clause." 444 U.S. at 295, 100 S.Ct. at 566. In

any event, as explained above, it was at best fortuitous that the act of manufacturing the high-limit switch at issue in this case would have had consequences in New York.

In *Schaadt*, the Third Department found that personal jurisdiction could not be asserted over a West German corporation whose allegedly defective meat packaging machine caused injury in New York. Kramer & Grebe, GMBH ("Kramer"), a West German corporation, sold all of its products to Kutter, a Massachusetts corporation. Kutter then sold these products throughout the United States. Based upon these facts, the Court held that the foreseeability requirement could not be met and personal jurisdiction could not be asserted over Kramer. *Schaadt*, 169 A.D.2d 969, 564 N.Y.S.2d 865

■ In the instant case, the "tortious act without the state causing injury to person or property within the state" was the allegedly defective manufacturing of the high-limit switch incorporated into the sauna heater purchased by plaintiff for use in the Club. N.Y.Civ.Prac.L. & R. § 302(a)(3). EGO committed this tort in Germany. Under the standard adopted by the New York Courts, and in light of the factual record in this case, there is no basis for concluding that it would have been foreseeable to EGO that this allegedly tortious act would have consequences in New York. Indeed, the switch in this action reached New York in an even more round-about way than did the chair component in *Murdock* which arrived in New York from Germany by way of Britain.

EGO manufactured the switch in Germany, and then sold the switch to a Swiss company. The Swiss company, in turn, sold the switch to its Norwegian subsidiary. This Norwegian company then sold the switch to a Finnish corporation which installed it into one of that company's products in Finland. From there, in plaintiff's words, the switch "found its way" to New York, presumably by way of H.B.C., Inc. and Helo Saunas from Finland. (Letter from Harrington of 9/24/97.) This long and indirect journey appears a most unlikely way for the EGO product to have reached New York. Indeed, plaintiff accepts EGO's characterization of EPI as its "exclusive" distributor of products to the United States, an "exclusive" distributor which nevertheless had no involvement in the commerce of the particular switch at issue in this case. (Opp. at 16.)

■ In a substantial bit of misdirection, plaintiff devotes considerable attention to the relationship between EPI and EGO. In short, plaintiff argues that EPI serves the United States, with EGO's encouragement, and that EGO therefore avails itself of the New York market, a "significant, undifferentiated portion" of the larger American market. (Opp. at 5.) In this way, plaintiff contends, it was foreseeable that EGO's conduct would have consequences in New York. This argument, delivered with considerable force, is simply besides the point: the particular switch at issue in this case did not go through EPI; rather, it "found its way" into New York through a far less likely and far more attenuated process. It simply was not foreseeable that the disputed switch—routed from Germany to Switzerland to Finland, and not at all through EGO's "exclusive" United States distributor—would have caused an injury of any type in New York. This is dispositive: Section 302(a)(3)(ii), by its plain language, requires that it would have been foreseeable that the allegedly tortious act would have consequences in New York; not that it would have been foreseeable that other of the defendant's acts would have had consequences in New York. *See Penny v. United Fruit Co.,* 869 F.Supp. 122, 129 (E.D.N.Y.1994) ("although the allegedly tortious act need not itself be directed at New York, there must be a reasonable basis to expect that the act itself will have consequences there."); *see also Fantis Foods, Inc. v. Standard Importing Co., Inc.,* 49 N.Y.2d 317, 425 N.Y.S.2d 783, 402 N.E.2d 122 (1980) (holding that defendant could show neither injury nor foreseeability of New York consequences, because the disputed product was to be delivered to Chicago); *In re DES Cases,* 789 F.Supp. 552 (E.D.N.Y.1992) ("The 'reasonable expectation' element of Section 302(a)(3)(ii) requires that a defendant foresee that its tortious act will have *some* consequences in New York, although not necessarily the exact consequences that occurred."). The extent of EGO's presence in New York

via EPI is therefore irrelevant for purposes of applying Section 302(a)(3)(ii).[3]

Even entertaining plaintiff's unwarranted focus upon EPI, plaintiff's arguments are largely unpersuasive. Plaintiff argues that "neither *Woodson* nor *Asahi* nor any of the New York cases cited by EGO suggest that 'purposeful affiliation' requires conduct on the part of the defendant directed at New York *alone.*" (Pl.'s Memo.Opp.Summ.J. at 5). Plaintiff goes on to assert that when a manufacturer attempts to target the U.S. market as a whole, it in effect is attempting to serve the New York market, at least indirectly. (Pl.'s Memo.Opp.Summ.J. at 7). Consequently, in making "discernable efforts" to serve a national market, in part through its dealings with EPI, EGO has made the same efforts to serve the New York market. Other examples of EGO's "discernable efforts," as provided by plaintiff, include EGO's efforts to procure Underwriters Laboratory ("UL") listings on its products, and the publishing of an English-language catalog and English-language technical drawings for EGO products.

Plaintiff cites cases "which recognize that specifically designing a product for the American market, with the expectation that the product will be distributed and used throughout the country, constitutes 'designing a product for the forum state.'" *See Tobin v. Astra Pharmaceutical Products, Inc.,* 993 F.2d 528 (6th Cir.) (holding that a Kentucky district court should properly have exercised jurisdiction over a Dutch pharmaceutical manufacturer where corporation sought FDA approval for the product in question.), *cert. denied,* 510 U.S. 914, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993); *Vermeulen v. Renault U.S.A., Inc.,* 975 F.2d 746, 760 (11th Cir.1992) (holding that a Georgia district court could properly exercise personal

jurisdiction over a French auto manufacturer for the manufacturer's "availment of a national market through its active and profitable association with a national distributor constituted purposeful activity directed at Georgia."); *see also Stokes v. L. Geismar, S.A.,* 815 F.Supp. 904 (E.D.Va.1993) ("finding jurisdiction over foreign manufacturer where there was no evidence that foreign manufacturer or its U.S. distributor attempted to limit U.S. marketing strategy to avoid Virginia."), *aff'd,* 16 F.3d 411 (4th Cir.1994). In other circumstances, and in other jurisdictions, these arguments might be persuasive. New York's courts, however, have interpreted Section 302(a)(3)(ii) conservatively. As noted, in *Schaadt,* for instance, the Court did not extend jurisdiction over a German manufacturer—not unlike EGO—that sold all of its products to a Massachusetts company—not unlike EPI—which then sold those products throughout the United States. *Schaadt,* 564 N.Y.S.2d at 866.

■ Section 302(a)(3)(ii) does not stretch the long-arm of New York law as far as it might otherwise be stretched. Indeed, in *Talbot v. Johnson Newspaper Corp.,* 71 N.Y.2d 827, 829, 527 N.Y.S.2d 729, 731, 522 N.E.2d 1027, 1028–29 (1988), the New York Court of Appeals, in declining to extend personal jurisdiction over California residents, noted that "the New York long-arm statute does not provide for in personam jurisdiction in every case in which due process would permit it." *See also* Joseph McLaughlin, Practice Commentaries to CPLR § C302:1 at p. 71 (1990) ("New York has still not exhausted the full jurisdictional potential permissible under the federal constitution."); 1 Weinstein, Korn, & Miller, *New York Civil Practice* ¶ 302.14 (1994) ("Although subdivision (a)(3) was enacted in order to augment New

---

**3.** It is for this reason that the Court rejects plaintiff's request for additional discovery concerning the relationship between EGO and EPI. Specifically, plaintiff seeks to confirm its suspicion that EGO and EPI share a common ownership, and that EGO is therefore closely apprised of EPI's activities on its behalf throughout the United States. (Opp. at 18.) Because the high-limit switch at issue in this case was not routed through EPI, however, EGO's relationship with EPI in marketing its products to New York— even if plaintiff's speculation could be con-

firmed—would have no bearing on the proper application of Section 302(a)(3)(ii). Indeed, even if EGO was well aware that some products shipped to EPI might reach New York, there is no basis for supposing that EGO could have anticipated that the particular device at issue in this action ever would have reached New York. Moreover, as explained in Section IIB, *infra,* the value of EGO products sold to New York via EPI has not been so substantial to provide an independent basis—under Section 302(a)(3)(i)—for conferring jurisdiction in this action.

York's jurisdiction over nondomiciliaries beyond that permitted by the restrictive opinions of the Court of Appeals, the subdivision was not designed to go to the full limits of permissible jurisdiction."). In sum, plaintiff's arguments—which would at best present a close call elsewhere—must be rejected by this Court applying New York law. Moreover, those arguments ignore a most inconvenient fact for plaintiff in this case; whatever the likelihood that certain EGO products would reach New York (*i.e.*, those distributed by EPI), it was highly fortuitous that the device at issue in this case ever did.

### B. Section 302(a)(3)(i)

Plaintiff invokes Section 302(a)(3)(i) as an alternative basis for asserting jurisdiction over EGO. Section 302(a)(3)(i) allows the Court to assert jurisdiction over a nondomiciliary who "derives substantial revenue from goods used or consumed or services rendered in the state." N.Y.Civ.Prac.L. & R. 302(a)(3)(i) (McKinney's 1990).

In *Allen v. Auto Specialties Mfg. Co.*, 45 A.D.2d 331, 357 N.Y.S.2d 547, 550 (3d Dept. 1974), the Third Department held that "[t]he phrase (substantial revenue) should be construed to require comparison between a defendant's gross sales revenue from interstate or international business with total gross sales revenue, and between defendant's net profit from interstate or international business with total net profit."

 For the five-year period in question, EGO's total revenues from sales of its products into the State of New York was $53,738.03, approximately $10,000 per year. Its total sales for the relevant period were 2,085,000,000 Deutschmarks which, at present conversion rates of approximately .60 dollars to the mark computes to approximately $1,251,000,000. Thus, New York sales account for 0.00429% of EGO's total sales.

The extent of EGO's business in New York stands well below the minimum percentages the state courts have found adequate to extend jurisdiction. In *Murdock*, for instance, the Court determined that Section 302(a)(3)(i) was not satisfied where New York sales accounted for 0.05 percent of defendant's revenue, amounting to $9,000. *Murdock*, 554 N.Y.S.2d at 889; *see also New England Laminates Co., Inc. v. Murphy*, 79 Misc.2d 1025, 362 N.Y.S.2d 730, 734 (N.Y.Sup.Ct.1974) ("holding that where only 4% of out of state corporation's revenues were derived from sales in state, such amount could not be considered 'substantial revenues' within meaning of subd. (a)3(i)"); *Chunky Corp. v. Blumenthal Bros. Chocolate Co.*, 299 F.Supp. 110 (D.C.N.Y.1969) (denying jurisdiction where 4% of defendant's revenues were derived from New York).

Plaintiff offers an alternative figure for EGO's total revenues from indirect sales into the State of New York during the time period January 1991 to September 1996. (Pl.'s Response Def.'s Rule 3(g) Stmt ¶ 10.) Plaintiff notes that $53,738.03 was the amount of money received by EGO as a commission on sales of its products in New York state. The total sales of EGO products via EPI in New York during the five-year period in question, however, was $358,000, approximately $71,600 per year. This number would constitute approximately 0.03 % of EGO's total sales. This figure, 0.03%, is not substantially different from the 0.05% rejected as a basis for jurisdiction in *Murdock* and is far short of the 4% in *Murphy* and *Chunky* considered insubstantial within the meaning of Section 302(a)(3)(i).[4]

---

4. Plaintiff proposes a third figure, derived from the $24.9 million of EGO products that EPI sold throughout the United States between 1991 and 1996. Reasoning that New York is home to approximately 7 % of the United States' population, plaintiff argues that it can reasonably be estimated that roughly this percentage of $ 24.9 million has been earned by EGO in connection with products "used or consumed" in New York. (Opp. at 21–22.) On top of this figure, plaintiff would add some amount, not specified, to account for the fact that certain EGO devices incorporated into end products overseas—like the switch at issue in this case—undoubtedly reach New York. (Opp. at 22.) Plaintiff does not, however, propose to counterbalance this figure with a reduction accounting for those products sold by EPI to United States manufacturers who might also have sold their products internationally. In any event, to engage in the sort of speculation proposed by plaintiff would be to remove any concrete factual predicate from the jurisdiction equation, and would thereby undermine the

New York courts have recognized that "[t]o limit the issue of jurisdiction in all cases to a comparison of the ratio of sales in individual states to total sales would, in all probability, insulate a large corporation ... from possible liability in most individual states of the union." *Allen v. Canadian General Elec. Co.*, 65 A.D.2d 39, 410 N.Y.S.2d 707, 709 (3d Dept.1978), *aff'd*, 50 N.Y.2d 935, 431 N.Y.S.2d 526, 409 N.E.2d 998 (1980); *see also Ball*, 902 F.2d at 199–200 (approving of district court's determination that "substantial revenue in either an absolute or relative sense will support long-arm jurisdiction"). Thus, in *Allen*, where the 1% of defendant's business transacted in New York amounted to $ 8.79 million, the Third Department conferred jurisdiction. In reaching its determination, the Court reasoned that "[i]t be difficult to convince an economist that sales of approximately $9 million were not substantial regardless of their ratio to total sales." *Allen*, 410 N.Y.S.2d at 709.

Cases like *Allen* and *Murdock* define the extremes. Nine million dollars is obviously substantial, whereas nine thousand dollars obviously is not. Unfortunately, New York's courts provide little guidance for those fig-ures in between.[5] While the five year total of $ 358,000 involved in this case is a large sum by many standards and for many purposes, it simply is not on the order of the "the $ 8 or $ 9 million of sales" that the *Allen* Court most recently determined would justify jurisdiction without regard to the percentages involved. *Allen*, 410 N.Y.S.2d at 709. Indeed, $358,000 generated over a five-year period during the 1990s is not remotely of the same magnitude as $8.79 million generated in 1976, and does not suggest nearly the same risk of a company with a massive corporate presence throughout the United States being insulated "from possible liability in most individual states of the union." *Id.* Absent any indication from the state courts that such a figure is nevertheless "substantial," particularly where it represents only a minuscule percentage of a defendant's overall business, this Court is unable to confer personal jurisdiction over EGO pursuant to Section 302(a)(3)(i).

### *CONCLUSION*

For the reasons set forth above, defendant's motion for summary judgement is hereby **GRANTED.** The Clerk of the Court

---

most basic constitutional tenet of jurisdiction—to provide a defendant with fair notice that its activities might render it amenable to suit in a particular jurisdiction. *See World–Wide*, 444 U.S. at 297, 100 S.Ct. at 567 ("The Due Process clause ... gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."); *see also World–Wide*, 444 U.S. at 295, 100 S.Ct. at 566 (denying jurisdiction in California, although accepting that defendant was aware that "some" of its tire valves "would be incorporated into tire tubes sold in" that state); *cf. Ball v. Metallurgie Hoboken–Overpelt*. 902 F.2d 194, 200 (2d Cir.) (rejecting New York jurisdiction in absence of "hard evidence" revealing extent of sales to New York consumers) (citations omitted), *cert. denied*, 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). It is not surprising, then, that the figures evaluated by the Courts in *Murdock* and *Allen* more directly reflected the sales of defendants' products into New York and were not premised upon the sort of creative accounting proposed by plaintiff. *Murdock*, 554 N.Y.S.2d at 888–89 (limiting its consideration of defendant's New York revenues to the $ 9,000 of sales "conducted with a furniture wholesaler located in New York," despite the fact that those sales did "not involve the particular chair part" at issue in that case); *Allen*, 410 N.Y.S.2d at 708 (permitting jurisdiction on basis of defendant's "sales of goods and services ... made to customers in New York state.").

5. A handful of federal cases, decided over twenty years ago, are somewhat inconsistent and generally unhelpful. *See Goggi Corp. v. Outboard Marine Corp.*, 422 F.Supp. 361, 364 (S.D.N.Y.1976) (permitting jurisdiction, under "substantial revenue" language of Section 302(a)(3)(ii), based upon $ 140,000 of New York sales by a company otherwise involved in nation-wide commerce); *Nichols v. Surgitool, Inc.*, 419 F.Supp. 58, 62 (W.D.N.Y.1976) (permitting jurisdiction based upon $ 259,935.70 of New York sales over seven years totaling 7 % of defendant's overall business); *Path Instruments International Corp. v. Asahi Optical Co.*, 312 F.Supp. 805, 809–810 (S.D.N.Y.1970) (reasoning that $ 85,021.45, generated in ten months, "[i]n absolute terms ... would not seem to be the 'substantial' revenue contemplated by 302(a)(3)(ii)."). Taken together, however, *Nichols* and *Path* are most consistent with the view that the five year total of $ 358,000 involved here—which does not represent anything on the order of 7% of EGO's business—does not, "in absolute terms," provide a basis for jurisdiction.

is directed to enter judgment dismissing defendant Electro–Geratebau from this action.

**SO ORDERED.**