Steven L. HENSLEY; Wilburn R. King and wife, Margaret King; Plaintiffs,

v.

DANEK MEDICAL, INC., (now known as Sofamor Danek Group, Inc.), and Warsaw Orthopedic, Inc., Defendants.

No. Civ. 1:96CV300.

United States District Court, W.D. North Carolina, Asheville Division.

May 5, 1998.

Steven L. Hensley, Fairview, NC, pro se.

William F. Horsley, Greensboro, NC, for plaintiffs.

J. Donald Cowan, Jr., Smith, Helms, Mulliss & Moore, Greensboro, NC, for defendants.

### *MEMORANDUM AND ORDER*

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the Defendants' motion for summary judgment against Plaintiffs Wilburn R. and Margaret King who oppose the motion. For the reasons stated below, the Court grants the Defendants' motion and dismisses the action as to the Plaintiffs King.

### I. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving parties, here the Plaintiffs. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Defendants as the moving parties have an initial burden to show a lack of evidence to support Plaintiffs' case. *Shaw, supra* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the Plaintiffs who must convince the Court that a triable issue does exist. *Id.* Such an issue will be shown "if the evidence is such that a reasonable jury could return a verdict for the [Plaintiffs]." *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.*

Thus, in considering the facts of the case for purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the Plaintiffs. *Matsushita Electric Industrial Co. v. Zenith*

*Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### II. STATEMENT OF FACTS

In 1961, Wilburn King injured his back while lifting a steel cabinet at work. Exhibit 1, Deposition of Wilburn King *attached to* Defendants' Motion for Summary Judgment, at 12 ["Defendants' Motion"]. He suffered a ruptured disc which was repaired during surgery by Dr. Bruce Galloway. *Id.* King returned to work with no limitations. *Id.,* at 14 ("I was good as new after that."). He had no other back problems until one day in 1979 when he got out of bed and could not straighten up. *Id.,* at 14–15. King had suffered a ruptured disc in a different location and again had back surgery. *Id.,* at 15–16. He returned to work and experienced no additional back problems until 1990 when once again he suffered a ruptured disc while getting out of bed one morning. *Id.* His third surgery was performed by Dr. Lawrence Kroll; but this time when he returned to work, he was unable to lift as much weight or stand for prolonged periods of time. *Id.,* at 17. He continued to work until March 1992 when he had another attack of back pain which was so severe he could not work. *Id.,* at 20–21. Dr. Kroll referred King to Dr. Keith Maxwell because of the latter's specialization in spinal disease. *Id.,* at 21. At the time of the referral, Dr. Kroll felt there was evidence that King suffered from arachnoiditis.[1]

In April 1992, Dr. Maxwell removed two herniated discs and performed a laminectomy[2] and fusion using the Texas Scottish Rite Hospital (TSRH) internal fixation device. Exhibit 4, Deposition of Dr. Keith M. Maxwell *attached to* Defendants' Motion, at 36; Exhibit 26, Letter from Dr. David E. Tomaszek, dated May 13, 1997, *attached to* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ["Plaintiffs' Memorandum"]. As explained by Dr. Maxwell, he

1. An inflammation of the membrane covering of the spinal cord causing root and spinal cord symptoms similar to those caused by pressure from a tumor. *Dorland's Illustrated Medical Dictionary,* (28th ed.1994).

2. The excision of the posterior arch of a vertebra. *Dorland's, supra.*

placed screws in King's pedicles[3] at L3, L4 and L5 and the sacrum[4] and connected them with rods.[5] Maxwell Deposition, *supra.* He then took a bone graft and performed a fusion of L3 to the sacrum. *Id.*

King testified that after the last operation he continued to have back pain but it was different than the pain he had experienced previously. Exhibit 30, King Deposition, *attached to* Plaintiffs' Memorandum, at 30. He experienced burning, numbness and sometimes a shooting pain. *Id.* Dr. Maxwell was of the opinion that this pain was caused by nerve damage which had been sustained during the various back surgeries. *Id.*, at 32. King testified that before his last surgery he was in so much pain that he could not straighten up. *Id.*, at 41. After the surgery, he was able to straighten up but still had pain although it was different and not as severe. *Id.*

In 1994, King saw Dr. Lawrence Brown for his continued pain. Dr. Brown reviewed "multiple old x-rays" but noted there were no films which had been taken after Dr. Maxwell's surgery. Exhibit 8, Progress Notes of Dr. Lawrence P. Brown, dated November 9, 1994, *attached to* Plaintiffs' Memorandum. Dr. Brown opined that the "left sacral screw is loose. Bone graft appears not to be homogeneous and somewhat fragmented at least on the left side. I can't be certain that the fusion is solid. The rod is long on the right side. No instrumentation appears to be broken." *Id.* About one month later, Dr. Brown made additional notes after reviewing a myelogram and CT scan. He advised King that

> the myelogram did not show any extra dural[6] impingement, did show[ ] probably some low spinal sac arach[n]oiditis. CT

scan did not show any other abnormality other than the presumed arach[n]oiditis. It is thought that he has a loose screw in the lower left side and a longer rod on the right side at the top. Discussion is had concerning what the problems might be. He may have a failed fusion. He may have loose instrumentation. He may have a bursitis secondary to the metal dorsally and proximally over the long rod.

*Id.* (footnote added). Although Dr. Brown recommended further surgery, King has not had any additional surgery.

Plaintiffs have designated only one expert witness who is familiar with King's condition, Dr. David Tomaszek who is a neurological surgeon.[7] Dr. Tomaszek was deposed in May 1997 and testified that a surgeon's clinical decision to use an internal fixation device is unrelated to approval of that device by the Federal Drug Administration (FDA). Exhibit 5, Deposition of Dr. David E. Tomaszek, *attached to* Defendants' Motion, at 47. Dr. Tomaszek also testified that in his opinion, the surgery performed by Dr. Maxwell probably led to a fusion. *Id.*, at 63. As to Dr. Brown's progress notes, he opined that Dr. Brown was only speculating because his conclusions were made without any follow-up films or notes. *Id.*, at 63–64. Thus, he found no evidence that the screw was in fact "loose." In addition, King's major disability stems from arachnoiditis, but that condition was not caused by the insertion of the internal fixation device. *Id.*, at 69–70.

> Surgery can worsen arachnoiditis. Intradural bleeding, intradural contrast, manipulation of the dura, et cetera, can all lead to intradural scar so the fact that he's had

---

3. Paired parts of the vertebral arch that connect the laminae to the vertebral body. The laminae are the pair of bone plates which flare out from the pedicles and fuse together to complete the dorsal part of the arch. *Dorland's, supra.*

4. The triangular bone just below the lumbar vertebrae formed by five fused vertebrae and wedged dorsally between the two hip bones. *Dorland's, supra.*

5. According to one of the Plaintiffs' general expert witnesses, the purpose of inserting a metal device such as that manufactured by the Defendants is to stabilize the bones while the bone

graft grows. Exhibit 2, Letter of Harold Alexander, Ph.D., dated January 31, 1996, *attached to* Plaintiffs' Memorandum.

6. The third membrane covering the spinal cord. *Dorland's, supra.*

7. While the case was pending with the Multidistrict Litigation Panel, it appears that Plaintiffs designated general expert witnesses as to issues involving the design and use of orthopedic screw devices. However, only one "case specific" witness was identified who has actually reviewed King's medical history.

multiple operations over the years with multiple myelograms, I'm assuming, since many of his operations were in pre-MRI era, including a 1992 operation which was an extensive and lengthy one, all contributed to his arachnoiditis. So the arachonoiditis is, in my opinion, lots of myelograms, four back operations, and not directly related to the fact that hardware was placed at the fourth [operation] .... [Based on the evidence] I do not believe [the hardware] caused [the arachnoidal scarring] and I do not believe it contributed significantly to it.... The diffuse mechanical back pain is not related to the hardware. It is certainly possible that the back pain at the top of the patient's incision where Dr. Brown alleges that there is impingement from a long contact with the facet above it. There's always some overriding of the hardware whether it's a rod, a screw, or a plate. So the fact that it is there can cause mechanical pain by soft tissue irritation or by irritation of the facet capsule.... So in this case specifically, and in all cases regardless of the history, I distinguish between local trigger point myofacial pain and diffuse peri-incisional pain. Mr. King's peri-incisional pain is not related to his hardware. Any facet impingement pain or trigger point pain, ... more likely than not is....

*Id.,* at 70–74. However, according to Dr. Tomaszek, King's leg pain is unrelated to the presence of hardware. *Id.,* at 75.

Just prior to the time of his deposition, Dr. Tomaszek wrote an opinion letter in which he stated that Dr. Maxwell used the "appropriate operative technique." Exhibit 26, Letter of Dr. Tomaszek, *supra.* He reiterated his opinion that King's major problem stems from intradural lesion or arachnoiditis. *Id.*

> Even though Mr. King seems to have developed a classic failed back surgery syndrome with not only mechanical back pain but nerve injury, I do not believe that this problem was negatively impacted by the use of pedicle screw fixation. There is no clear documentation, despite the loosening of the screw, that the fusion has failed. There certainly is no indication that the hardware is mal-positioned or that the

hardware has broken. The one part of the patient's pain that I feel is clearly related to the hardware is the back pain at the top of the incision, which probably is related to the TSRH rod impinging on the facet above or on the soft tissues adjacent to the facet. Even if the rod is "to[o] long" this [is] not an unusual complication of hardware. Hence, this is a case in which there is a small component of the patient's movement related [to] mechanical back pain that, in my opinion, is related to the hardware and without further definitive evidence that if surgery to remove loosened or broken hardware is required, I do not feel that there are additional adverse consequences related to the hardware in this case. *I do not feel that the arachnoiditis and leg symptoms are related to the hardware in any event.*

*Id.* (emphasis added).

### III. DISCUSSION

 Plaintiffs' complaint alleges six causes of action, all of which are predicated on the allegation that following the implantation of the device, his pain not only continued but over time became worse and was proximately caused by the breaking, bending or failure of the device. Plaintiffs' first claim is for negligent testing and inspection of the device prior to manufacture and marketing and failure to warn thereafter. This is essentially a products liability cause of action predicated on negligence, the essential elements of which are "(1) evidence of a standard of care owed by the reasonably prudent person in similar circumstances; (2) breach of that standard of care; (3) injury caused directly or proximately by the breach; and (4) loss because of the injury. In addition, a plaintiff must present evidence the product was in a defective condition at the time it left the defendant's control." *Nicholson v. American Safety Utility Corp.,* 124 N.C.App. 59, 64–65, 476 S.E.2d 672, 676 (1996), *rev'd in part on other grounds,* 346 N.C. 767, 488 S.E.2d 240 (1997) (citations omitted). "Summary judgment is generally inappropriate in a negligence action." *Id.* Nonetheless, it may be proper when there are no issues of witness credibility and the evidence shows a lack of negligence. *Id.* Thus, if one of the

essential elements to establish negligence cannot be shown by the evidence, summary judgment may be appropriate. *Id.*

▊ Assuming *arguendo* that Plaintiffs have established the first two elements, the issue is whether they have shown that a proximate cause of King's injury was the internal fixation device manufactured by the Defendants. Dr. Brown opined King suffered from arachnoiditis and speculated that he "may" have a failed fusion, loose screw or bursitis. Plaintiffs claim Dr. Brown's progress notes establish that the screw had loosened, a fact which shows a design defect. However, the doctor did not opine that the screw was loose; he stated merely that King *may* have a loose screw. Dr. Tomaszek opined there was no evidence of failure of the device and noted that fusion appeared to have been successful. King's pain, in his opinion, is caused by arachnoiditis, a condition which he clearly stated was not caused by the device manufactured by the Defendants. Dr. Tomaszek did note that King had some small degree of pain at the top of the incision where the rod "may" impinge on soft tissue but this was not caused by the length of the rod; it was simply a complication of the use of hardware. He did not state that it was caused by this particular hardware, but simply noted it may occur when any internal fixation device is used.

▊ In North Carolina, a jury award cannot be sustained in the absence of expert medical testimony on the issue of causation. *Click v. Pilot Freight Carriers, Inc.*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). "[W]here the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." *Id.* Plaintiffs have not presented any expert medical evidence that a proximate cause of King's injury and pain is the use of the medical device manufactured by these Defendants. *Thacker v. City of Winston–Salem*, 125 N.C.App. 671, 676, 482 S.E.2d 20, 23, *rev. denied*, 346 N.C. 289, 487 S.E.2d 571 (1997) ("The record is devoid of any medical evidence to establish the necessary causal

relationship without conjecture and remote possibility.").

Plaintiffs observe in a footnote of their memorandum that this Court has the discretion to allow them to present additional expert reports. However, the Multidistrict Litigation Panel to which this case was initially assigned entered a pretrial order requiring the parties to nominate fact specific expert witnesses within specified time periods. Plaintiffs have not named any expert witness other than Dr. Tomaszek. And, assuming the unlikely event that this Court would allow additional experts at such a late date, Plaintiffs did not make any such request.

▊ In opposition to the motion, Plaintiffs point to the expert report of Dr. Harold Alexander who noted that one risk of pedicle screws involves their potential to loosen, break or bend with resulting injury to surrounding tissue. However, that report was not fact specific: it was not based on this Plaintiff's medical condition and history or these Defendants' device. Moreover, his report is not expert medical evidence on causation because Alexander is not a medical doctor. *Click, supra.*

▊ Plaintiffs also argue that the Defendants' violations of FDA and other regulations constitutes negligence *per se.* Indeed, the bulk of the Plaintiffs' brief is devoted to discussion of the widespread marketing by Defendants of their device in contravention of federal law. Even if negligence *per se* were established here, "[w]e must still determine, however, whether such negligence 'was the *proximate cause* of the injury for which recovery is sought.'" *Al–Hourani v. Ashley*, 126 N.C.App. 519, 523, 485 S.E.2d 887, 890 (1997) (emphasis in original) (citations omitted); *Spurlock v. Alexander*, 121 N.C.App. 668, 671, 468 S.E.2d 499, 501, *rev. denied*, 343 N.C. 753, 473 S.E.2d 619 (1996) ("To recover under a negligence *per se* theory, the plaintiff must still prove that the defendant's statutory violation proximately caused the plaintiff's harm."). Accepting Plaintiffs' claims that the Defendants violated federal law by their marketing of this device without FDA approval, they still have not produced medical evidence that the use of the Defendants' device is a

proximate cause of King's injury and pain. Thus, this claim fails.

■ The same analysis applies to the Plaintiffs' claim that the Defendants' failure to warn renders them liable.

A *manufacturer* must use reasonable care in the design and manufacture of products, and this includes the duty to perform "reasonable tests and inspections to discover latent hazards." ... In addition, a manufacturer is under an obligation to provide warnings of any dangers associated with the product's use "sufficiently intelligible and prominent to reach and protect all those who may reasonably be expected to come into contact with [the product]." Failure to warn adequately renders the product defective.

*Nicholson,* 124 N.C.App. at 65, 476 S.E.2d at 676 (emphasis in original) (citations omitted). Assuming the Defendants failed to warn of latent hazards inherent in the use of their device, there still is no medical evidence that the insertion of the Defendants' device into King's back was a proximate cause of his pain and injury. No matter how egregious a defendant's conduct, there still must be evidence sufficient to support the causation element. *See, e.g., Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548 (Plaintiff must establish each essential element of the case in an action involving allegation that plaintiff had failed to show exposure to the defendant's asbestos product.); *Jones v. Owens–Corning Fiberglas Corp.,* 69 F.3d 712, 716 (4th Cir.1995) (Plaintiff successfully showed continuous exposure to defendant's asbestos product.). It is thus unnecessary to reach the parties' arguments concerning the learned intermediary doctrine.

Defendants also note that Judge Bechtle has previously dismissed Plaintiffs' cause of action based on fraud. This Court's review of the record shows that position is in fact accurate. Judge Bechtle ruled that there is no private right of action based on violations of the FDA regulations or fraud committed on the FDA. Final Pretrial Order of the Transferee Court, filed February 17, 1998, at 26. That ruling is presently on appeal to the Third Circuit which has not yet rendered any decision. Because the ruling constitutes the law of the case, Plaintiffs' claim remains dismissed.

Defendants accurately state that the express warranty claims were dismissed by the Transferee Court. Indeed, Plaintiffs have offered no opposition to the Defendants' position and thus, summary judgment is appropriate. Fed.R.Civ.P. 56.

The parties have referred to the Plaintiffs' amended complaint. The only complaint of record with this Court is not so designated and alleges causes of action based on breach of implied warranty and negligent infliction of emotional distress in addition to the claims considered herein. It may be that those claims have been disposed of by the Multidistrict Litigation Panel. Because the Court cannot ascertain the status of these causes of action, the parties will be given an opportunity to so advise. The Plaintiffs' loss of consortium claims which are derivative of claims dismissed herewith are dismissed as well.

The record is also unclear as to the status of the claims of Plaintiff Steven L. Hensely. The parties are requested to advise the Court as to Mr. Hensely's status.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' motion for summary judgment is hereby **GRANTED** as to the Plaintiffs Wilburn and Margaret King's claims based on negligence, products liability, negligence *per se,* fraud, express warranty and loss of consortium claims derivative thereof. The parties shall advise the Court in writing on or before 15 days from entry of this Order of any prior disposition of claims based on implied warranty and negligent infliction of emotional distress and the status of the claims of Plaintiff Steven L. Hensely. Such filings may not exceed five pages in length.