**Leila HARTWELL, Jennifer
Still, Plaintiffs,**

v.

**DANEK MEDICAL, INC.,
et al., Defendants.**

**No. 95–1134–R.**

United States District Court,
W.D. Virginia,
Roanoke Division.

April 16, 1999.

Jack Vernon Altizer, Altizer & Altizer, P.C., Roanoke, VA, Thomas J. Kliebert, Jr., Kliebert & Heltz, Gramercy, LA, for plaintiffs.

Dabney Jefferson Carr, IV, Mays & Valentine, Richmond, VA, Gary Joseph Spahn, Mays & Valentine, Richmond, VA, for defendants.

---

## MEMORANDUM OPINION

KISER, Senior District Judge.

Before me now are defendants Danek Medical, Inc., Sofamor Danek Group, Inc., and Sofamor, Inc.'s (collectively "Danek's" or "defendant's") motion for summary judgment.

In their Amended Complaint,[1] plaintiffs Leila Hartwell and Jennifer Still set forth a number of claims against the Danek defendants based on the design, manufacture, and marketing of the Texas Scottish Rites Hospital Device ("TSRH device" or "device"): fraud on the FDA (Count I); civil conspiracy (Count II); concert of action (Count III); fraudulent marketing and promotion (Count IV); negligent misrepresentation/strict liability under *Restatement (Second) of Torts* § 402(B) (Count V); strict liability (Count VI); liability *per se* (Count VII); negligence (Count VIII); breach of warranty (Count IX); and loss of consortium (Count X).[2] Danek seeks summary judgment on all counts on the grounds that the TSRH device is not defective and that the device did not proximately cause plaintiffs' injuries. Danek also raises specific defenses to various counts of the complaint, arguing that Still and Hartwell's claims were dismissed in the multi-district litigation ("MDL") proceedings (Counts I–III); they are not cognizable under Virginia law (Counts III, V, VI, VII and X); they are barred by the learned intermediary doctrine (Counts II–V, VII and VIII); and they do not state claims of negligence *per se* (Counts VII and VIII).

Both parties have fully briefed the issues involved and have been heard at oral argument. The motion is therefore ripe for disposition. For the reasons set forth herein, the defendant's motion for summary judgment is **GRANTED.** Because I find that the plaintiffs have failed to meet their burden of proof on the issue of causation, all of plaintiffs' claims fail on that basis, and I decline to address further plaintiffs' varied theories of liability or defendant's specific defenses thereto.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Leila Hartwell first injured her back in 1992, when she fell playing softball. Although she returned to work three weeks after the injury, her back worsened as the year progressed, and in January, 1993, she sought treatment from one Dr. Kipreos for her continuing pain. Ms. Hartwell returned to Dr. Kipreos in September and October of 1993. By that time, she was suffering some numbness in her right foot. Dr. Kipreos' prescribed regimen of physical therapy did not improve her condition. Toward the end of 1993, her back pain and symptoms caused by it began to interfere with her work attendance. She sought lighter duty at work but there were no such positions available.

Upon Dr. Kipreos' referral, Ms. Hartwell went to see spine specialist Dr. James M. Leipzig. She complained to Dr. Leipzig that basic activities like walking, standing, and sitting caused her pain, and that previous treatments had failed to resolve her recurrent back problems. Based on her representations to him, Dr. Leipzig recommended that she undergo spinal fusion surgery. Spinal fusion surgery is a last resort treatment for severe, incapacitating back pain. The objective of spinal fusion surgery is to connect adjacent vertebrae that have become unstable due to disease or injury by packing small chips of bone from the patient's hips between or alongside the affected vertebrae. If the surgery is successful, the transplanted bone eventually fuses with the vertebrae to

---

1. Plaintiffs' Second Amended Complaint merely added additional defendants, all of whom were later dismissed. This opinion will refer only to the Amended Complaint.

2. In their opposition brief to the defendant's motion for summary judgment, the plaintiffs withdrew their 402 A strict liability and loss of consortium claims as non-cognizable under Virginia law (Counts V and X). With the withdrawal of the loss of consortium claims, plaintiffs' spouses, William Hartwell and Robert Still, originally named as plaintiffs, are no longer parties to this action.

create solid bony mass, or arthrodesis, that stabilizes the affected area of the spine, and, ideally, alleviates or diminishes the pain caused by spinal instability.

Dr. Leipzig performed this spinal fusion surgery on January 20, 1994. At that time, he implanted in Ms. Hartwell a spinal fixation device, the TSRH device, in order to promote fusion between the different sections of her spine. Surgeons use these spinal fixation devices to immobilize the vertebrae while fusion takes place. The device is attached to the patient's spine by hooks, screws, or wires, or a combination of these components. The TSRH device, the kind of device used in both Ms. Hartwell's and Ms. Still's surgeries, was, in their procedures, secured with pedicle bone screws.[3]

Following surgery, Dr. Leipzig continued to treat Ms. Hartwell until September 28, 1994. At that time, in Dr. Leipzig's opinion, there was no evident malfunction of the TSRH device, although he was concerned that she might have a psuedoarthrosis, or non-fusion.

In December of 1994, Ms. Hartwell began seeing Dr. William Richardson. After examining Ms. Hartwell, Dr. Richardson, too, felt that she may not have had a solid fusion, and he recommended a second fusion operation, which would require the removal of the first fusion device before a second fusion procedure was attempted. Ms. Hartwell opted to have an uninstrumented procedure this time around.[4] She underwent this surgery on January 27, 1995. During the surgery, however, Dr. Richardson found that Hartwell's fusion was, in fact, solid, so he removed the TSRH device and did not perform a second fusion. Dr. Richardson testified that he saw no malfunctioning or misplacement of the device at the time of explantation, although his postoperative notes indicate possible loosening of the pedicle screws. Despite the solid fusion in her spine, Ms. Hartwell's surgeries did not achieve the desired results, and her back pain continued after the surgical removal of the TSRH device.

Like Ms. Hartwell, Jennifer Still has had a long history of back problems. She first began having back pain in 1989, five years before her fusion surgery in June, 1994. In February 1994, her back went out, and she was rendered unable to continue working. She consulted with her treating physician, Dr. Vaughan, about her pain following the February 1994 incident. Dr. Vaughan prescribed physical therapy

---

**3.** The pedicles are two bony tubular arches on either side of the vertebral body. At the time of Hartwell's and Still's surgeries, the FDA had cleared Danek's TSRH device for labeling and marketing for a variety of spinal indications, but had not cleared it for fixation by bone screws to the pedicles of the lumbar spine. Plaintiffs assert that such unapproved use was unreasonably dangerous and illegal. Danek contends that such use was merely a "off-label" use commonly employed in these kinds of surgeries since the 1980s, and not governed by the FDA's regulation of labeling and marketing. This dispute over the import of FDA labeling guidelines in determining the legality of medical practices is at the heart of many of plaintiffs' claims, and at least tangential to all of them. As noted earlier, however, I need not reach a decision on this theory of liability where plaintiffs' cannot show causation, a necessary predicate under any theory grounded in product defect. I will mention, however, that on July 27, 1998, the FDA issued a Final Rule in which it stated that "pedicle screw spinal systems" are safe and effective. 63 Fed.Reg. 40025, 40031 (FDA Jul. 27, 1998). The Final Rule also recognized that pedicle fixation had been a off-label use of the screws for some time, and is considered by many doctors to be the standard of care. 63 Fed.Reg. at 40026, 40036, 40037. While I do not decide what the implications of this prospective rule might be on litigation commenced before its issuance, it certainly seems to cast doubt on the viability of claims that Danek defrauded the FDA by encouraging off-label use of the screws for non-approved spinal indications.

**4.** An uninstrumented procedure is one that forgoes the use of an implanted stabilizing instrument like the TSRH device. Dr. Richardson had recommended that Ms. Hartwell have a second *instrumented* fusion because he thought the instrumentation bettered the chances for a successful fusion. As it turned out, no second fusion procedure was necessary.

and medication, but her condition did not improve.

Dr. Vaughan referred Ms. Still to Dr. Leipzig, the same physician who performed the implantation surgery on Ms. Hartwell. Dr. Leipzig recommended spinal fusion surgery for Ms. Still as well. In June, 1994, Dr. Leipzig implanted the TSRH device affixed by pedicle screws in Ms. Still's back, the same kind of procedure he performed on Ms. Hartwell.[5] Through the time of his last contact with Ms. Still in January of 1995, Dr. Leipzig saw no evidence of a malfunction or defect of the device.

Dr. Richardson performed an explantation procedure on Ms. Still in conjunction with a second fusion procedure, just as he did with Ms. Hartwell. Like Ms. Hartwell, Ms. Still desired an uninstrumented fusion procedure for her second surgery. During surgery, Dr. Richardson found that Ms. Still's spine had not achieved the hoped-for fusion, and he went ahead with the second, but uninstrumented, fusion procedure. During the surgery, Dr. Richardson observed no sign of breakage of the device or any injury caused by it.

On October 23, 1995, plaintiffs Hartwell and Still filed this personal injury action.[6] This Court exercises jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332. In the Amended Complaint filed October 29, 1996, plaintiffs brought claims against a long list of defendants based on the design, manufacture, promotion, and sale of the TSRH device. The gravamen of the Amended Complaint is that the TSRH device was defective and unreasonably dangerous, but that, through conspiratorial acts of fraud and misrepresentation on the part of defendants, the device was made available to spine surgeons and implanted in patients like Hartwell and Still, in violation of FDA regulations. Almost all of the original defendants, including doctors, other spinal device manufacturers, and various medical organizations, have long since been terminated as parties. Only the Danek defendants remain. On December 18, 1995, this case was transferred to an MDL proceeding in Philadelphia, Pennsylvania before the Honorable Louis C. Bechtle. *In re Orthopedic Bone Screw Products Liability Litigation,* MDL Docket No. 1014 (E.D.Pa.). After presiding over discovery matters and certain pretrial motions, Judge Bechtle remanded the case to this Court for resolution.[7]

DISCUSSION

## I. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropri-

---

5. Dr. Leipzig testified to one irregularity in Ms. Still's surgery. He was unable to place a screw in Still's right L4 pedicle because that pedicle was in an abnormal anatomical location. Leipzig Dep. at 88–89. Dr. Leipzig did not feel that leaving that screw out affected the chances of successful fusion. *Id.* at 90–91.

6. This case, and many like it, was filed following a December 1993 broadcast of the television program "20/20" focusing on the use of bone screws in spinal fusion surgery. The program suggested that the widespread use of pedicle screws in fusion surgeries was improper because the screws had not been approved for that particular spinal indication.

7. At oral argument in this case November 19, 1998, plaintiffs' counsel informed the Court that two of Judge Bechtle's earlier rulings, Pre-trial Orders 12 and 845, which effectively terminated plaintiffs' fraud-on-the-FDA claims, had been reversed by the Third Circuit. On December 30, Judge Bechtle issued Pre-trial Order 1649 acknowledging that the Third Circuit had reversed PTOs 12 and 845 and advising remand courts that plaintiffs could now pursue these claims in the transferor courts, and that the transferor courts should determine whether such claims stated a cause of action under the applicable state law of each court. After the reversal of the MDL court by the Third Circuit, I permitted the parties in this action to submit briefs about the possible reinstatement of these fraud-on-the-FDA claims. I will not decide here, however, whether such reinstatement would be either procedurally or substantively permissible in this case. Because such fraud claims would rest on the same injury and causation issues underlying all of plaintiffs' claims, they would necessarily fail for the reasons enunciated here for granting summary judgment on all counts.

ate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial and summary judgment is appropriate. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In considering a motion for summary judgment, the court is required to view the evidence in a light most favorable to the nonmoving party and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.) (citations omitted), *cert. denied*, 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994). Once the movant has met its burden, "the nonmoving party must come forward with specific facts showing there is a genuine issue for trial" in order to defeat the summary judgment motion. *Matsushita Electric*, 475 U.S. at 587, 106 S.Ct. 1348. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and [. . .] it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under Rule 56(e), the plaintiffs must introduce admissible evidence demonstrating a genuine issue of fact on each element of their claims.

## II. Plaintiffs Must Demonstrate Proximate Cause

■ Under any theory of tortious injury, one requisite element of a claim is a "causal connection between defendant's conduct and plaintiff's injury." *Owens v. Bourns, Inc.*, 766 F.2d 145, 151 (1985). "The law of products liability in Virginia does not permit recovery where responsibility is conjectural." *Boyle v. United Technologies Corp.*, 792 F.2d 413, 415 (4th Cir.1986). To succeed on a products liability claim, the plaintiff must demonstrate that a product defect is the only reasonable explanation or cause of the complained-of injury. *Boyle*, 792 F.2d at 416.

Thus, it is clear that as a threshold matter, for Ms. Hartwell and Ms. Still to proceed under any theory of recovery, they must, at the very least, present enough credible evidence for me to conclude that a genuine issue of material fact exists as to whether the TSRH device was the cause of the injuries alleged. In the absence of this proof, all of the plaintiffs' claims collapse of their own weight. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

■ Proof of legal causation in a medical device case must be by expert testimony and the expert's opinion must be stated in terms of reasonable probability. *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 972 (4th Cir.1990). Accordingly, the plaintiffs have each presented a "causation expert," retained in the course of litigation for the express purpose of providing this Court with an opinion on the cause of plaintiffs' various back problems. Dr. Lance O. Yarus, the causation expert offered by Ms. Hartwell, stated in deposition that he was retained for the purpose of providing a "causal statement" for the plaintiff. Yarus Dep. (5/21/98) at 16.[8]

**8.** The two experts offered by plaintiffs, Dr. Yarus and Dr. Pennell, each gave two depositions in this case. Each gave a "global" deposition providing background information about themselves and general theories of liability relevant to all cases in this MDL proceeding, in addition to a deposition specific to the plaintiffs in this action. Dr. Yarus' Janu-

When asked during the course of his deposition why he had not seen Ms. Hartwell himself, read her deposition, or talked to her treating physicians, he testified that he wanted to "focus" on his "task in providing a causal statement," for which he did not need to go to such lengths. *Id.* at 14–15. Dr. Robert R. Pennell was retained for similar purposes by plaintiff Still. When asked in deposition what he considered his "assignment" to be in the litigation, he testified that he had been contacted by one of plaintiff's attorneys whom he understood to be "interested in the causation as to whether or not the pedicle screws had resulted in the injury." Pennell Dep. (12/16/97) at 18.

The testimony of these two experts is all that plaintiffs offer to make the obligatory connection between injury and defect. This testimony is therefore crucial to the success of these cases. The adequacy of the doctors' testimony on the cause of injury to these women is the first, and perhaps foremost, obstacle to these cases reaching a jury. Routinely, this is not a particularly daunting obstacle to surmount. Even a cursory review of the reports and deposition testimony offered by these doctors, however, reveals several initial proof deficiencies. First, neither Dr. Yarus or Dr. Pennell have ever examined the patients on whose conditions they are to opine nor are they well-versed in the procedure at issue. Opinions formed without the substantial benefit of personal knowledge of patient or subject are greatly undermined by this want of experience. In a case related to this MDL litigation, one court noted that its decision to find in favor of the defendants was influenced by its skepticism that doctors could "competently discover such causal relationships with the spine from a desk." *Moses v.*

*Danek Medical, Inc.,* 1998 WL 1041279 (D.Nev.1998).

A second obvious problem with the doctors' testimony is that it suffers from a lack of specificity about a hardware-related cause of injury, focusing instead on the issue of whether the implantation of the hardware was warranted at all in either patient. It will not be enough to survive a defendant's challenge on proof of cause for a doctor to state that the surgery itself was performed in error. This is not a medical malpractice case, this is a products liability claim. Dr. Yarus, in his global deposition, given for the purpose of providing testimony generally relevant to all of the bone screw litigation cases in which he was going to be an expert witness, declared "this [device] shouldn't have been placed in [patients' spines] in the first case in most of the cases I've reviewed." Yarus Dep. (1/30/98) at 202. In his deposition relating specifically to Ms. Hartwell's case, the following colloquy took place between Dr. Yarus and the examiner:

Q: So then I'm clear your testimony is this woman should not have had fusion surgery?

A: Based on the singular diagnosis of a 5 S1 disk it would appear that's correct.

Q: So is it fair to say that you disagree with the procedure that the doctor used in this case?

A. Absolutely, yes.

Q: And it is your opinion that it was wrong for him to pursue this type of procedure?

A. Absolutely, yes.

Q. And it is your opinion that it was wrong for this doctor to pursue a fusion generally with or without instrumentation?

A: Based on that diagnosis, yes.

ary 30, 1998 deposition was taken in the MDL, *Leigh v. Danek Medical, Inc.,* CA No. 95–8021 (E.D.Pa.). His testimony in that global deposition was incorporated by reference in his deposition on May 21, 1998, taken in this case. Dr. Pennell's global deposition

was taken on December 16, 1997, in the related case in the MDL, *Bruzer v. Sofamor Danek,* CA No. 95–8026 (E.D.Pa.). His case-specific deposition was taken December 17, 1997. I will identify the doctors' depositions by date when referring to them.

Q: Is it fair to say that it's your opinion that the doctor chose the wrong surgery for this patient?

A: Based on the record it would appear that way, yes.

Q: And it is your opinion that the patient was harmed as a result?

A: Definitely, yes.

Yarus Dep. (5/21/98) at 23. If Dr. Yarus believes that Dr. Leipzig performed the wrong procedure in light of the diagnosis, and that this medical judgment error was the cause of the injury, then that theory is completely inapposite to a theory proposing that a defect in the product caused the injury. In fact, if Dr. Yarus is suggesting that the injury was caused by malpractice, then Danek is off the hook. Even if Dr. Yarus is testifying that he believes none of these surgeries should have been performed because the TSRH device was always "defective" for implantation on the pedicles, he is still implicating the independent medical judgment of the implanting physicians who chose to pursue this off-label use of a device approved for other spinal indications, not the device itself.[9] Likewise, it would be insufficient for the causation expert to merely testify that the surgery itself was not successful or did not achieve the desired results. Dr. Pennell's report specifically identifies the failure of the spinal fusion, the "nonunion . . . at the L4 to L5 level," as the cause of Ms. Still's continuing pain. Pennell Expert Report at 2–3. If it is the failed surgery that is the cause of her pain, and not the failed device, and if the doctor cannot point to a device failure as the cause of the failure of the fusion, then the doctor cannot make a prima facie case for causation by the instrumentation. Dr. Pennell himself testified that the mere fact that a patient doesn't improve after surgery doesn't necessarily mean that the surgeon did poor job or that the implanted hardware is to blame for the unsatisfactory outcome. Pennell Dep. (12/16/97) at 70.

A third general weakness in the testimony of both doctors as to causation is that the reports and depositions are utterly devoid of reference to other potential causes which the doctors have ruled out as the source of injury to Ms. Still and Ms. Hartwell. "It is a well-established principle of Virginia products liability law that where there is more than one possible cause of an injury, the plaintiff must show with 'reasonable certainty' that the defendant caused the injury." *Stokes v. L. Geismar, S.A.,* 815 F.Supp. 904, 908 (E.D.Va.1993) (quoting *Boyle,* 792 F.2d at 416). Dr. Yarus himself admitted that in order to correctly attribute cause to one source, a doctor has to rule out other possibilities as to the person's pain. Yarus Dep. (1/30/98) at 215–217. Dr. Pennell testified that a patient may have a poor surgical result for many reasons unrelated to instrumentation. Pennell Dep. (12/16/97) at 65–67, 70–71. Both expert reports offered, however, fail to exclude other possible causes for the plaintiffs' painful conditions, specifically the possibility that one or both plaintiffs might suffer from degenerative disk disorders or other persistent neurological conditions. Other courts considering this deficit in the testimony found it fatal to other plaintiffs' claims. In *Conger v. Danek Medical,* 1998 WL 1041331, 4:96–CV–739–A, 16 (N.D.Tex. Dec. 14, 1998), the court considered Dr. Pennell's testimony in that case and found it wanting because it did not rule out the possibility that physician negligence or some other unidentified cause was to blame for the alleged injury. Another court found Dr. Yarus' method of causal identification, which it termed "simple logic," "inadequate in light of the failure to exclude other causes." *Moses,* 1998 WL 1041279 at 7. Pennell's and Yarus' testimony is likewise crippled in the cases before this Court by the failure to exclude alternative explanations of injury. Where an expert's opinion merely cites a 'cause

---

9. Following this line of reasoning, the plaintiffs also stumble backward into the learned intermediary doctrine, which, if applicable, would also preclude their claims.

and effect' relationship, without supporting medical data which can eliminate other causes, it is merely a conclusory opinion. See *Moses*, 1998 WL 1041279 at 7; *Love v. Danek Medical*, 1998 WL 1048241 (W.D.Ky.1998).

## III. *Daubert* Analysis

Having outlined my general skepticism about the plaintiffs' ability to carry their burdens of proof on causation, I now turn to the issue of the admissibility of the expert opinions of Doctors Yarus and Pennell in light of the guidance provided by the Supreme Court on expert opinion admission in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and more recently in *Kumho Tire Co. v. Carmichael*, —— U.S. ——, 119 S.Ct. 1167, 143 L.Ed.2d 238, (U.S.Ala.) (1999).

In *Daubert*, two minor children, born with serious birth defects, and their parents, sued a pharmaceutical company alleging that the birth defects were the result of the mothers' ingestion, during pregnancy, of a prescription drug manufactured by the defendant intended to combat nausea. 113 S.Ct. at 2791. In the district court, the defendant moved for summary judgment on the grounds that the plaintiffs would not be able to come forward with any admissible evidence that the named anti-nausea drug was the cause of the birth defects. *Id.* In support of its motion, the defendant presented the expert opinion of a "well-credentialed" physician and epidemiologist who, after reviewing more than 30 published studies on the drug and birth defects, testified that none of these studies had shown the anti-nausea drug to cause malformations in fetuses. *Id.* In response, the plaintiffs, while not disputing the defendant expert's evaluation of the published epidemiological literature, submitted the testimony of eight experts of their own, who also possessed superior credentials in various fields from biostatistics to chemistry. *Id.* at 2791 fn. 2. While these experts all con-cluded that the drug could cause birth defects, their conclusions were not based on the vast body of epidemiological literature on the drug and its possible link to birth defects. *Id.* at 2791–2792. The district court judge granted the defendant's motion for summary judgment, holding that given the extensive body of epidemiological data existing on the drug's effect on fetal development, expert opinion not based on this data was not admissible to establish causation. *Id.* at 2792. The district court judge based his holding on a theory of "general acceptance," stating that scientific evidence is admissible only if the principle upon which it is based is generally accepted in its respective scientific field. *Id.* The Court of Appeals for the Ninth Circuit upheld the district court on similar grounds.

The Supreme Court, however, rejected the "general acceptance" standard adopted by the lower courts, and established a test premised on the parameters set forth for expert testimony admission in the Federal Rules of Evidence. *Id.* at 2795. Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or other education, may testify thereto in the form of an opinion or otherwise.

The Court held that Rule 702 served to "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 113 S.Ct. at 2799. The Court stated that this test of reliability and relevance should begin with a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 2796. The Court offered a non-exclusive list of factors a court might consider in making its decision on admissi-

bility: whether the scientific theory has been tested, whether the theory has been subject to peer review, if the theory has a known rate of error, and if it does enjoy "general acceptance" in its relevant scientific community. *Id.* at 2797. The Court repeatedly emphasized, however, that the test judges should apply is a flexible one, taking into account many factors, and that Rule 702 was designed to allow the trier of fact considerable discretion in his "gatekeeping" role. *Id.* at 2798–99.

In *Kumho Tire*, the Supreme Court again addressed the question of the district court's role in determining the admissibility of expert testimony, and took up questions remaining about the breadth and contours of the *Daubert* decision.[10] In *Kumho Tire*, the district court had decided not to admit the testimony of an expert in tire failure analysis, not because it doubted his qualifications, but because, after considering the *Daubert* factors, it considered his methodology unreliable. *Kumho Tire*, —— U.S. —— 119 S.Ct. 1167 at 1176–77, 143 L.Ed.2d 238. The Eleventh Circuit Court of Appeals reversed, saying that the district court had erred as a matter of law in excluding the testimony. *Id.* at 1173. The Supreme Court disagreed with the Eleventh Circuit. The Court held that the district court not only enjoys broad latitude in making the ultimate decision in whether to admit expert testimony, it is also privileged to choose what factors it will consider when making that decision:

> The test of reliability is "flexible," and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in re-

spect to its ultimate reliability determination.

*Id.* at 1171. "[T]he gatekeeping inquiry must be tied to the facts of a particular case." *Id.* at 1175 (quoting *Daubert*, 113 S.Ct. at 2796) (internal quotations omitted).

In light of this guidance provided by the Supreme Court, I understand the test I am to apply as one hung from the framework of Rule 702 and supported by factors like those elucidated in *Daubert*, but overall, as a test which requires my best judgment as to the soundness of the expert opinion proffered, taking into consideration any and all factors I find compelling based on the facts before me. While there are certainly times when, given the complexity of issues or the ferocity of the debate, it may seem expedient just to let opposing experts do battle at trial, the Supreme Court has made clear that to do so, without due circumspection, would be shirking my duty as evidentiary "gatekeeper" to the trial process. I will consider the admissibility of each doctor's testimony in turn.

■ The search for reliability of an opinion of an expert begins with an examination of his methodology. The factors urged upon the trial judge by *Daubert* all go directly to the legitimacy of the means by which he has reached his conclusions. All four *Daubert* factors, testing, peer review, error rates, and acceptability, bear upon, in some part or another, the reliability of methodology. In considering these factors, and undertaking to consider the opinion offered as a whole, and in conjunction with the record, construing doubt in favor of the plaintiffs, as I must, I find Dr. Yarus' methodology to be deeply flawed, and his testimony therefore inadmissible in this Court.

---

**10.** The principal holding of this case was that the *Daubert* test of reliability applies not just to scientific experts, but also to engineers and other experts who are not, in a clinical sense, scientists. *Id.* at 1171. This holding is not particularly relevant for purposes of the instant case, since the experts before this Court are physicians. The *Kumho* opinion as a whole, however, is highly instructive on the proper role of a district court in making preliminary evidentiary decisions concerning expert witnesses, refining the idea of a broad discretionary standard first mentioned in *Daubert*.

Although I have previously touched on some of these issues in expressing my doubt about the plaintiffs' ability to make a causative link between device and injury, I note them again here with additional specific detail in order to highlight the flaws in the methodology Dr. Yarus employed in rendering his opinion in this case. First of all, Dr. Yarus' incomplete review of Ms. Hartwell's medical records is hardly an adequate basis for his diagnosis of pedicle screw causation. Dr. Yarus has not seen Ms. Hartwell, talked to her, or read her deposition. Yarus Dep. (5/21/98) at 14–15. He has not talked to either her implanting or explanting physicians. *Id.* More significant to me, however, is that he has not reviewed any of the x-rays or other imaging studies done of Ms. Hartwell's spine. *Id.* at 16. His review consisted entirely of the pre and post-operative reports of the treating physicians and some general literature on pedicle screw fixation, a procedure with which he was not previously familiar. *Id.* at 11, 15–18. He felt that for production of a causal statement in association with litigation, such in-depth review was not required. *Id.* at 15. Without evidence of what the imaging studies reveal, Dr. Yarus' testimony is derived entirely from the notes of Doctors Leipzig and Richardson. Dr. Yarus relies heavily on Dr. Richardson's post-operative notes of January 27, 1995. *Id.* at 95. Based principally on his review of these notes, he found that one or more of the screws had become loose and that the toggling of the screws produced a "windshield wiper" effect and this produced pain, pain that she would not have had but for the device. *Id.* at 95–96. Dr. Yarus gives no testimony as to how in this particular case the screws might have caused pain, no testimony as to nerve damage or nerve root irritation or the like. Given the testimony of Dr. Richardson, the doctor who performed the explantation surgery and made the post-operative notes, that he did not see any loosening of the screws or hardware, and saw no other signs of nerve or muscular damage, I find that Dr. Yarus has made a quantum, and untenable leap to infer on the basis of his review that the screws caused injury to Ms. Hartwell. Richardson Dep. 46–37, 50, 59, 64. Although upon his initial consultation with Ms. Hartwell, Dr. Richardson had hypothesized that a loose screw might be causing her pain, he did not find evidence of this during the explant operation. *Id.* at 41, 59.

Furthermore, at Dr. Yarus' deposition, defense counsel meticulously took him through Ms. Hartwell's symptoms both before and after surgery, and the doctor was unable to distinguish between any pain or symptoms she was having before the operation and symptoms she was having after the operation. Dr. Yarus was also unable to rule out possible other causes of Ms. Hartwell's pain, particularly a possible diagnosis of multiple sclerosis to which her pain might have been attributable. Although he states at one point in the deposition that he was able to rule out MS based on the character of Ms. Hartwell's pain, his deposition testimony as a whole makes clear that MS is outside his specialty, that he is unaware about her present diagnosis concerning MS, and that the symptoms of MS would be consistent with those Ms. Hartwell experienced. Yarus Dep. (5/21/98) at 41–45, 79, 102–103. Dr. Richardson testified that Ms. Hartwell's later symptoms were, in fact, more consistent with a diagnosis of MS. Richardson Dep. at 84. Dr. Yarus admits that lumbar fusion surgery sometimes results in poor outcomes for a number of reasons other than the use of instrumentation including psuedoarthrosis, infection, surgical error, the failure of the patient to follow post-operative directions, the patient's weight, or the patient's psychological condition. Yarus Dep. (1/30/98) at 195–197. Dr. Yarus concedes that a patient can have a solid fusion, like Ms. Hartwell, and still experience no relief of symptoms. Yarus Dep. (5/21/98). Dr. Yarus admits that in order to demonstrate cause-and-effect between pain and the implanted hardware, these other possibilities must be ruled out,

yet he fails to do so. Yarus Dep. (1/30/98) at 215–217. The only connection he makes between the plaintiff's pain and the TSRH instrumentation is the alleged loosening of the screws based on Dr. Richardson's surgical report. He is also unable to provide any explanation for why, upon removal of the suspect screws and TSRH hardware, Ms. Hartwell's pain continued unabated. Both Dr. Richardson and Danek's case-specific expert, Dr. J. Michael Simpson, take this fact as demonstrable proof that the device was not to blame for Ms. Hartwell's pain. Report of Dr. Simpson at 6–9, Richardson Dep. at 84–85.[11]

Dr. Yarus' testimony falls short when measured by the any of the *Daubert* factors. His armchair-quarterback style evades meaningful testing, eludes peer review, and makes error rates incalculable. The factor that overwhelmingly mitigates against admission, however, is general acceptability. It is simply inconceivable that the scientific community would, to any degree, find it acceptable to make dramatic diagnoses of the type at issue here simply by reviewing the operative notes of other doctors and briefly familiarizing oneself with the procedure performed. All of the doctors here except Dr. Yarus, including Dr. Pennell, have testified that the most important indicators they have for correctly diagnosing a patient's condition are the patient's own words, the results of their own physical examination of the patient, and the imaging studies produced during the course of the patient's treatment. To make an assessment of Ms. Hartwell without the benefit of these pieces of information is not just to be negligent in one's evaluation, but to render that evaluation completely unreliable; and unreliability is at the core of what the *Daubert* factors are designed to ferret out.

At the heart of Dr. Yarus' sloppy methodology, of course, is the fact, discussed earlier, that he simply did not agree with the pedicle screw implantation procedure. Thus it became immaterial to him whether the screws themselves caused harm once implanted; to him, the procedure was improper, ergo, harmful. His syllogism is that the device was not suited for the purpose for which it was implanted; that the implantation required attachment by pedicle screws, and that the loosening of the screws in turn produced pain. It seems obvious, however, that if this was the wrong procedure to do—indeed Dr. Yarus testified that Dr. Leipzig committed malpractice to implant this device (Yarus Dep. (5/21/98) at 23–24)—then that would have been the cause of any pain, suffering, or lack of healing that the surgery brought about.

In *Pulice v. Smith,* No. 97–2080, 18 (W.D.Ark. Sept. 15, 1998), Judge Hendren, via telephone conference ended the case before summary judgment arguments by refusing to admit the testimony of Dr. Yarus on a similar claim, saying: "It's just his view, apparently, based upon what he has read in the MDL submissions and briefs that it's just not a good idea to do [these surgeries] and I don't believe there's a basis to support receipt of his testimony." This does indeed appear to be Dr. Yarus' view, and it certainly does not support legal causation. Furthermore, it is a view which I am unsure he is even qualified to take. Dr. Yarus is an osteopathic, not an orthopaedic surgeon. Yarus Dep. (1/30/98) at 67–69. He is not board-certified by the American Academy of Orthopaedic Surgeons. *Id.* He has never taught any kind of spine surgery or published any articles on the topic. *Id.* at 65, 152–53. He has not performed any kind of

---

11. Even if plaintiff had been able to show a causal connection between the device and the alleged injury, plaintiff's claim must still fail because she has not even attempted to show that the injury was caused by a defect in the device. All parties concede that neither Dr. Yarus or Dr. Pennell are qualified to testify as to the design of the device, and plaintiff has offered no other evidence on this point. Though I do not to address that failure in this decision, I note that in *Talley v. Danek Medical,* 7 F.Supp.2d 725 (E.D.Va.1998), Judge Merhige found in favor of Danek on that ground.

lumbar surgery since 1990 or 1991, and has never performed surgery using implantation devices. *Id.* at 125. He has never even seen the instrumentation at issue in this case, or any other internal fixation system. *Id.* at 58–60. He read only the general literature on pedicle screw fixation provided him by the plaintiff in preparation of his expert report, and has not reviewed any of the other studies on the topic indicating the higher rate of fusion obtained by use of internal fixation devices. *Id.* at 11–13. In short, I find that his qualifications render him ill-equipped to comment on either the efficacy or propriety of this type of spinal surgery. Opinions based on his ill regard for the use of pedicle screw fixation are at best conclusory, and, at worst, just bad science and junk medicine.[12]

Dr. Pennell's testimony suffers from the same defects evident in the testimony of Dr. Yarus. Prior to producing his expert report, Dr. Pennell did not examine or speak to Ms. Still, talk to Ms. Still's treating physicians, review any radiographic studies, or review any of the deposition testimony in this case. Pennell Dep. (12/17/97) at 7–9. Despite this rather cavalier approach to the production of his expert report, Dr. Pennell testified than when treating his own patients, he performs a physical examination of every patient with low back pain before making a judgment on the source of pain, and examines the patient's x-rays personally. Pennell Dep. (12/16/97) at 22, 26. In fact, prior to this litigation, he had never written an expert report on a patient he had not examined. *Id.* at 53–54. Prior to composing his report, Dr. Pennell had no information on Still's pre-surgery functional ability, no information about the level or type of her pre-surgery low-back pain, or her pre-surgery leg pain. *Id.* at 16–17.

Dr. Pennell seems to attribute much of the plaintiff's continuing pain following the initial implantation to the failed fusion (*id.* at 9, 38–39), yet he admits that non-union is a recognized risk of fusion surgery and that non-union can happen irrespective of whether instrumentation is used or not. *Id.* at 11–13. He also acknowledges that fusion surgery may have a poor outcome for many reasons unrelated to instrumentation, such as a problem at a different level of the spine, infection, or scarring. Pennell Dep. (12/16/97) at 65–67. He testified that merely because a patient who underwent instrumented fusion surgery had a bad outcome (i.e., non-fusion) does not mean that the instrumentation caused the poor outcome. *Id.* at 70–71. Dr. Pennell admits that none of Ms. Still's treating physicians attribute her non-union to the device and that Dr. Richardson concluded there was no loosening of the device. Pennell Dep. (12/17/97) at 19, 25. The doctor conceded that the explanting physician was in a better position to assess the status of the hardware and positioning of the device. *Id.* at 8.

Dr. Pennell seems to find causation based on two conclusions he has drawn from his truncated review of the medical records. First, based on an x-ray report, not the x-ray itself, which he has not seen, Dr. Pennell claims that Ms. Still suffered a fracture of a pedicle. *Id.* Dr. Leipzig, however, specifically testified that there was no damage done to the pedicles during the implant surgery. Leipzig Dep. at 88–91. Likewise, Dr. Richardson testified that he saw no fracture of the pedicles during his explant surgery. Richardson Dep. at 64. Second, Dr. Pennell attempts to demonstrate a causative link by claim-

---

12. Other courts have taken a more cynical view of Dr. Yarus' expert opinion. After reviewing the history of Dr. Yarus' involvement with this litigation, including the fact that he has prepared at least 82 expert reports, like the one he prepared on Ms. Hartwell, for $1,000 a piece, and reviewing his rather slim qualifications for undertaking to provide expert reports in this matter, one court found that "[t]he only conclusion to be drawn in this case is that Yarus' testimony was influenced by a litigation-driven financial incentive." *Leigh v. Danek Medical,* 1998 WL 1041329 (N.D.Tex.1998).

ing that Ms. Still's pain, following the implantation surgery, was worse in her left leg. Pennell Dep. (12/17/97) at 17–18. Ms. Still, however, testified that she had no symptoms in her left leg. Still Dep. at 13.

Other than this alleged leg pain, Dr. Pennell is unable to point to any post-operative symptoms which differ from those from which she suffered prior to surgery. Furthermore, like Dr. Yarus, Dr. Pennell is unable to eliminate other possible causes for Ms. Still's continuing pain, particularly the possibility of a degenerative disk disease. Like Dr. Yarus, Dr. Pennell acknowledged that to make a conclusion that hardware was the cause of Ms. Still's pain, the pain must be effectively correlated to the presence of the hardware through the facts and particulars of each particular case, yet he fails to do so. Pennell Dep. (12/16/97) at 71. He is also at a loss to explain why, if the hardware was the cause of Ms. Still's pain, that the pain did not improve once the device was explanted. Pennell Dep. (12/17/97) at 10–11.

Dr. Pennell engages in the same type of conclusory analysis that Dr. Yarus is guilty of. Both make a temporal connection between the implantation and the pain: because there was an implantation, and there was then continuing pain, the pain must be the result of the implantation. For the reasons set forth in my analysis of Dr. Yarus' testimony, Dr. Pennell's testimony fails to meet the reliability test established in *Daubert*.

Additionally, Dr. Pennell also faces qualification problems similar to, though perhaps not as severe as, those faced by Dr. Yarus. While Dr. Pennell is an orthopaedic surgeon, he has not performed surgery of any kind since 1985. Pennell Dep. (12/16/97) at 39–40. He has never performed surgery using internal fixation devices, and has never seen the TSRH device used in plaintiff's surgery. *Id.* at

54, 57. He admits that he is completely unfamiliar with the mechanical composition of the screw. Pennell Dep. (12/17/97) at 20. While Dr. Pennell's qualification deficiencies are not as glaring as those of Dr. Yarus, it is clear that his testimony was based on limited materials regarding pedicle screw implantation in general and limited medical records of Ms. Still in particular, in preparation for litigation. His familiarity with the subject matter is not organic, it was arrived at in conjunction with this proceeding.[13] While expert qualification is not specifically listed as a *Daubert* factor, it underpins all of the factors enumerated and consideration of expert qualification is consistent with the spirit of the *Daubert* reliability analysis.

Neither Ms. Still nor Ms. Hartwell can survive summary judgment where the only causation proof offered is that of an unreliable expert. I am further persuaded of this by the number of other courts involved in this same multi-district orthopaedic bone screw litigation that have decided in favor of the defendant on the grounds that the expert opinion offered that court failed to demonstrate a causative link. Plaintiffs nationwide have been consistently unable to produce experts who could make sound causal determinations, and have suffered the consequences of relying on this inadequate expert opinion. In *Smith v. Sofamor S.N.C.*, 21 F.Supp.2d 918 (W.D.Wis.1998), for example, the judge refused to consider the expert's conclusion, saying:

> Such a conclusion without any support is not one based on expert knowledge and is not entitled to the dignity of evidence. It has no scientific basis whatsoever. It is undisputed that plaintiff experienced significant and similar pain before his first surgery. It is also undisputed that fusion surgery, instrumented or non-instrumented, sometimes fails even though properly performed and that even when a solid fusion is obtained pain may not be reduced.

**13.** See *Conger v. Danek Medical,* 1998 WL 1041331 (1998) for a similar analysis of the testimony of Dr. Pennell in another pedicle

screw case. That court also decided not to allow Dr. Pennell's testimony and decided for Danek on summary judgment.

*Id.* at 921 (citation omitted). See e.g., *King v. Danek Medical, Inc.,* 32 F.Supp.2d 345 (W.D.N.C. May 5, 1998 and 1998 WL 665730 (May 29, 1998)) (plaintiff had not established by competent medical evidence that the device used in his spinal fusion surgery is the cause of his pain or injury); *Davis v. Danek Medical, Inc.,* 1998 WL 665708 (W.D.N.C.1998) (expert testimony did not prove that the pain was caused by a defect in the device); *Cali v. Danek Medical, Inc.,* 24 F.Supp.2d 941 (W.D.Wis. 1998) (medical expert's causation testimony deficient because he did not rule out other possible causes). The vast majority of courts considering the same issues before me today have reached the same decision I render here.

CONCLUSION

A physician's conclusion, without supporting medical evidence or reliable methodology, is insufficient to establish causation. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the ipse dixit of the expert." *Kumho Tire,* —— U.S. ——, 119 S.Ct. 1167 at 1179, 143 L.Ed.2d 238, (quoting *General Electric Company v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997).) I simply cannot take the opinions of the plaintiffs' proffered experts at face value.

Finding the testimony of Dr. Pennell and Dr. Yarus unreliable, and therefore unhelpful to the trier of fact, I refuse its admittance, and accordingly find in favor of the defendant Danek Medical against plaintiffs Hartwell and Still on the grounds that they have failed to show a causal connection between the alleged injury and the TSRH device.

The defendant's motion for summary judgment is hereby GRANTED.

An appropriate order shall issue.